UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

THE NEW YORK STATE NURSES
ASSOCIATION,

                 Plaintiff,

        vs.

MONTEFIORE MEDICAL CENTER,

                Defendant.

------------------------------------------------------------- x

Case No.

## COMPLAINT FOR INJUNCTIVE RELIEF

The New York State Nurses Association ("NYSNA"), on behalf of approximately 3,000 registered nurses ("RNs") it represents at Montefiore Medical Center ("Montefiore" or the "Hospital"), brings this lawsuit to redress severe and pervasive workplace hazards that are causing or are likely to cause the RNs imminent death or serious physical harm.

### Introduction

1.     Necessitated by the serious illness and, in some instances, death the nurses on the frontline of the COVID-19 pandemic are facing, NYSNA files this action for an injunction pending arbitration.  Last week, NYSNA initiated a grievance under the parties' collective bargaining agreement (the "CBA") challenging the Hospital's widespread and systemic failure during the COVID-19 pandemic to "take steps necessary to assure employee health and safety" as required under the CBA.  By the time that the grievance will be heard at arbitration and an award issues, it will be too late to remedy the harms caused by the Hospital's persistent failure to comply with its contractual obligations, particularly the serious illnesses that the nurses, their patients, and their families have already suffered.  NYSNA therefore seeks a

reverse *Boys Markets* injunction[1] to compel Montefiore to immediately take steps required to protect the nurses' health and safety pending the outcome of the arbitration.

## Jurisdiction and Venue

2.     This Court has jurisdiction of this action pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and 28 U.S.C. § 1331.

3.     Venue lies in this judicial district under Section 301(c) of the LMRA, 29 U.S.C. § 185(c), because the Hospital transacts business in this judicial district and NYSNA, its officers and agents represent and act for employee members in this judicial district.

## Parties

4.     Plaintiff NYSNA is a union of approximately 42,000 frontline nurses standing together for strength at work, their practice, safe staffing, and healthcare for all. NYSNA is New York's largest union and professional association for registered nurses and is the collective bargaining representative of registered nurses employed by the Hospital.  NYSNA represents approximately 3,000 nurses at the Montefiore Medical Center.

5.     Defendant Montefiore Medical Center is a private hospital operating several facilities, including Montefiore Medical Center (Moses Division), Jack D. Weiler Hospital of the Albert Einstein College of Medicine, Westchester Square Campus, Hutchinson Campus, and Montefiore Home Health Agency (hereinafter collectively the "Bronx facilities").

## Facts

The Coronavirus Pandemic

6.     We are in the middle of a global pandemic with no certain end date.  On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for New York State.

---

[1] *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235 (1970).

New York City Mayor Bill De Blasio and other local officials across the state followed suit soon after.  On March 13, 2020, President Donald Trump declared a national state of emergency.

7.      Here in New York, all but essential businesses have been shuttered and schools are closed.  Residents not engaged in essential work have been urged to remain at home unless they need to pick up food or medicine, and even then to wear masks and maintain at least six feet of social distance.

8.      Despite these efforts, New York State has become the epicenter of the epidemic.  As of April 15, more than 222,000 have tested positive for COVID-19, and more than 12,000 people have died.  *See* N.Y. Dep't of Health, *COVID-19 Tracker* (last visited Apr. 16, 2020).  New York State accounts for nearly half of the deaths in the entire country.  *See* Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in U.S.* (last visited Apr. 16, 2020).

The Impact of the Pandemic on Nurses

9.      RNs have high risk, physically demanding jobs where they routinely confront workplace violence, are obligated to lift heavy patients, and commonly experience other physical stressors.  Further, RNs often face occupational exposure to serious infectious diseases such as tuberculosis and influenza.  Because of these difficult working conditions, even prior to the COVID-19 pandemic, nursing had one of the highest rates of occupational injury and illness of any profession.

10.      The methods by which the COVID-19 virus is transmitted and the troubling death rate of this virus has created significant and persistent danger to RNs.  COVID-19 is transmitted through three basic methods: (1) contact with a contaminated surface; (2) aerosolized droplets, which are secretions from coughing and sneezing; and (3) airborne particles.  Transmission of COVID-19 can occur from simply touching a contaminated surface at

work, such as a computer at a nurses' station where reports are made, a bedrail, or a patient's tray.  RNs caring for COVID-19 patients, many of whom have a persistent and aggressive cough, are regularly exposed to aerosolized droplets.  Further, during medical procedures such as intubations, when COVID-19 patients are put on a ventilator to assist in breathing, the number of aerosolized droplets and the risk to RNs significantly increases.  Airborne particles are smaller and drier, so they travel farther and stay in the air longer.  The risk from airborne particles is particularly acute for RNs because, without proper ventilation, the air itself in a COVID-19 hospital unit can become contaminated and deadly.

11.     A recent CDC study dated April 14, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e6.htm?s_cid=mm6915e6_x, estimates that health care personnel constitute 19% of all COVID-19 cases in the United States, with at least 9,200 infected healthcare workers in the United States.

12.     It should come as no surprise then that COVID-19's toll on RNs in New York State has been particularly severe.  To date, state-wide at least eight NYSNA RNs have died due to COVID-19 contracted at work, and at least 84 NYSNA RNs have been hospitalized with life-threatening COVID symptoms.  Approximately 72% of NYSNA's members have been exposed to COVID-19 at work.  Even though testing has been only sporadically available for non-hospitalized nurses, 954 NYSNA RNs already have tested positive for COVID-19, including at least 150 at Montefiore.

13.     Based on membership survey results, NYSNA estimates that at least another 150 RNs at Montefiore could test positive for COVID-19 unless the Hospital takes immediate steps to assure their health and safety.

NYSNA's Efforts to Prevent Severe
Health and Safety Hazards at Montefiore

14.     Even before it became clear to many government leaders that the COVID-19 crisis would place unprecedented and severe burdens on New York's nurses, NYSNA sprang into action.

15.     Since January 2020, NYSNA has attempted to work with the Hospital to address the impending COVID-19 crisis by implementing basic safety measures for the nurses and their patients.  Sadly, NYSNA's efforts have been largely rebuffed or ignored by the Hospital.

16.     Once a month, NYSNA and the Hospital hold a Labor-Management meeting.  On the same day as that meeting, NYSNA and the Hospital also hold a Health and Safety meeting.

17.     On February 5, 2020, it was NYSNA, not Montefiore, that asked to devote the Health and Safety meeting on February 14 to discussing the environmental, health and safety precautions that could be taken to confront the coronavirus and flu surge.  NYSNA also asked that given the important nature of this discussion, all management personnel involved in health, safety and environmental/infection control issues should be present.

18.     On February 7, 2020, in an effort to attempt to contain the spread of the virus and protect NYSNA members, their patients, and the public, NYSNA requested that Montefiore produce information regarding it preparedness related to the care of COVID-19 patients and those patients under investigation ("PUI") for COVID-19.  The Hospital did not respond for 17 days, until February 24.  Its response was incomplete and demonstrated just how poorly prepared Montefiore was.

19.     At the March 13, 2020 Labor-Management and Health and Safety meetings, NYSNA asked that all future meetings be devoted to COVID-19 issues and that the parties immediately begin to hold daily conference calls with the Hospital's upper management to discuss COVID-19 issues.  It took a week for the Hospital to agree to such calls.  In the week interim, Montefiore held only facility-specific calls with that facility's management.

20.     At the March 13, 2020 Labor-Management meeting, NYSNA urged Montefiore to immediately adopt a series of measures necessary to assure the health and safety of nurses.  For instance, NYSNA insisted that, at a minimum, N95 respirators and other PPE should be used for all confirmed COVID-19 cases and PUI for COVID-19.  Montefiore resisted this request and responded that N95 respirators should be used only in limited circumstances for aerosol-generating procedures or for patients on airborne isolation.

21.     At the March 13, 2020 Labor-Management meeting, NYSNA repeated the request the Union first made in February—that Montefiore immediately erect tents outside the Emergency Departments of each facility for pre-screening and cohorting patients so that patients could be screened for COVID-19 before entering the Hospital and infecting the nurses and others.  Montefiore did so only belatedly, after other hospitals had already taken such measures.

22.     At the March 13, 2020 Labor-Management meeting, NYSNA had numerous other suggestions that either got rejected or belatedly accepted.

23.     Montefiore continues to resist cooperating with NYSNA.  On April 16, 2020, NYSNA and Montefiore had a call to address RNs' widespread and urgent health and safety concerns.  Management could not answer numerous health and safety questions regarding ventilation—a critically important factor in preventing viral infection from spreading to health care workers—saying they would refer the questions to their health and safety officer, Jared

Shapiro.  Despite NYSNA's prior requests, Shapiro was not on the call April 16, and Montefiore has yet to agree to the Union's request that he join their daily calls.  As of today, NYSNA has not received an answer to its questions on April 16.

The Severe Health and Safety Hazards At Montefiore

24.     Montefiore has become a major center for treating COVID-19 and suspected COVID 19 patients.  Right now, the Hospital is like a war zone.  The RNs there are treating large numbers of very sick and frightened patients, and are doing so with inadequate and often ill-fitting equipment, often in rooms that have not been properly converted to deal with COVID-19 patients, often working while they are sick because they have been forced back to work too early, often in practice areas where they have never been trained, and generally without adequate testing to ensure they are fit to work without infecting others.

25.     NYSNA brings this lawsuit because Montefiore has rejected the Union's repeated efforts to work with the Hospital to lessen the risks posed by COVID-19 so that more New Yorkers will not die needlessly—be they the Montefiore nurses themselves, the patients they care for, the doctors and other medical personnel with whom they work, the families they come home to, or the people whose paths they cross at the grocery store, the pharmacy, and on public transportation while traveling to and from work.  Nurses, as unwitting carriers, may pass the disease to someone who, because of age, a compromised immune system, or bad luck, suffers serious or even fatal consequences.  NYSNA asks this Court to intervene to minimize the risk of this occurring.

26.     The World Health Organization, the Centers for Disease Control and Prevention, and virtually every level of government have recognized that the only way to minimize casualties is to slow the disease's spread or, put differently, "flatten the curve." Flattening the curve may be accomplished by restricting the movement of those not engaged in

3042829.4

essential work, and for those, like nurses and other health care workers who are, taking specific precautions to minimize their exposure to the disease.

27.     For frontline healthcare workers like the Montefiore nurses, such precautions must include the provision of adequate protective masks, such as N95s, that are not improperly stored and reused day after day, and the provision of non-permeable gowns and other covering, both in sufficient numbers so that they may be changed when needed.  It also includes a proper space to don and doff such items so that disease-free areas in the hospital do not become contaminated, and so-called "negative pressure rooms" so that disease-infected air does not linger or, at the very least, an adequate number of high-efficiency particulate air ("HEPA") filters.  Finally, the precautions must include allowing nurses to take statutorily-guaranteed leave so that they are not forced to work while sick with COVID symptoms, appropriate statutorily guaranteed accommodations to protect their health, and coronavirus testing on demand so they do not come back to work too soon and infect their co-workers and patients.

28.     Instead of implementing these well-recognized polices, many endorsed by OSHA, that would keep its nurses (and, by extension, their patients and the public at large) safe, Montefiore management, through its actions and inactions, has created and allowed to flourish a number of severe and pervasive workplace hazards that are causing, and will continue to cause, the RNs serious physical harm, and possibly death.

29.     In order to safely care for COVID-19 patients, RNs must have respirators that protect them from both aerosolized droplets and smaller airborne particles.  Surgical masks are not respirators and are not effective in protecting RNs from aerosolized droplets and airborne particles from COVID-19 patients.  The normal standard of care in the United States is that disposable N95 respirators must be discarded after each patient care session.

3042829.4

30.     Effective, reusable respirators are powered air purifying respirators ("PAPRs") and elastomeric cartridge filter respirators.  OSHA directs that health care facilities first explore using reusable respirators, such as PAPRs and elastomeric cartridge filter respirators, prior to reusing disposable N95 respirators.

31.     OSHA requires health care facilities to fit-test the model and size of the N95 respirators that they distribute to RNs.  Fit-testing is a process where a technician measures whether there is a tight seal between the respirator and an RN's face.  If there is no tight seal, contaminated air can seep in through the side of the respirator and endanger the RN.  There are different models and sizes of N95 respirators and, if an RN fails a fit-test on one size or model, it is imperative, in order to protect the RN's health and life, that the employer continue fit-testing with different sizes and models until there is a proper fit.

32.     Montefiore, in contrast, is directing nurses to care for a patient with, or suspected of having, COVID-19: (a) without providing the nurses with N95 respirators; (b) providing the nurse with N95 respirators that have not been fit-tested to ensure an adequate seal, or (c) requiring the nurses to use the same N95 respirators for days, while caring for numerous patients.  The Hospital is also not providing the nurses with an undamaged and clean face shield.

33.     It is essential that health care facilities provide RNs with fluid-resistant or impermeable gowns and/or body covering that is changed every time an RN treats an infectious patient.  This is a serious infection control concern, which could result in new COVID-19 infections of patients, RNs, their families and their communities.

34.     Montefiore, in contrast, is directing nurses to care for a patient with, or suspected of having, COVID-19: (a) without providing the nurses with an impenetrable or fluid

resistant gowns, along with underclothing consisting of a head, neck, torso and foot covering; or (b) requiring the nurses to use the same gown while caring for more than one patient.

35.     Montefiore is also repeatedly exceeding, by large margins, the staffing ratios of the CBA.  As a result, nurses are physically and emotionally suffering from the enormous pressure and anxiety as they attempt to care for more patients than can reasonably be expected.  If anything, the fragile condition of COVID-19 patients requires greater, not less, attention and care than the usual patient.

36.     In order to safely remove PPE after use, a space must be used (or created) that allows PPE to be doffed without contaminating "clean" areas.  Negative pressure rooms often are designed with antechambers that accomplish this goal.  Space can also be created using prefabricated portable units or creating spatial divisions using fire-rated plastic with zippers. These are frequently set up in hospitals when construction work is being conducted.  Without adequate donning and doffing space, there is a risk that non-COVID areas can become contaminated, again needlessly putting RNs and non-COVID-19 patients at risk.

37.     Montefiore, in contrast, is failing to provide adequate donning and doffing space.

38.     It is a long-standing practice in healthcare to use negative air pressure rooms to care for infectious patients with airborne and droplet transmissible illnesses.  When done properly, this engineering control reduces the risk of a virus traveling into other areas and, by rapidly exhausting and exchanging air in an area, it reduces airborne levels of COVID-19, thus reducing the risk of staff exposure.  As per CDC recommendations, facilities can quickly create additional negative air pressure, HEPA filtered areas for the care of COVID-19 patients.

39.     Despite this clear CDC guidance, however, Montefiore has not done so, done so on only a limited basis, or done so in ways that the rooms or areas did not function properly.

40.     It is a major public health problem if RNs do not know their COVID-19 status, as they will inevitably unknowingly infect others.  Indeed, an employer that does not know which employees are COVID-19 positive will not be able to conduct an adequate health and safety risk assessment for the rest of their staff and their patients.

41.     Montefiore, however, is not providing its RNs with adequate testing on demand, including antibody testing.

42.     Montefiore is also requiring the nurses to operate equipment on which they had not been trained, requiring the nurses to work outside their competencies, without adequate training, and requiring the nurses to perform tasks for which they do not have training and/or certification.

43.     Montefiore is also not uniformly enforcing the visitor policy, thus risking the nurses and patients to further exposure to COVID-19.

44.     Even though members of the general public are directed to self-quarantine for 14 days, and if their employer has 100 or more employees, receive sick pay to recover during this period, Montefiore is directing nurses under quarantine/isolation orders or doctor attestations, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after seven days, regardless of whether the RN's symptoms had improved. The 14-day standard for isolation after testing positive for COVID-19 exists in order to safeguard the public and prevent the spread of the disease.  By being forced to return to work while they are still symptomatic and/or awaiting test results, Montefiore has endangered the health and

safety of their co-workers and their patients.  It is nothing less than a gamble with the nurses' and public's health.

45.     Montefiore is similarly refusing to reasonably accommodate nurses with underlying medical problems (such as autoimmune disorders and pregnancy).

46.     One example of the many ways Montefiore is failing to assure nurses' safety is that of Nurse-Practitioner Pam Brown.  On or about March 8, 2020, she and a colleague began seeing patients with COVID-19 symptoms.  At this time, she and the other Nurse-Practitioner began requesting that Montefiore provide them with PPE to protect themselves from exposure to COVID-19.  Brown and her colleague were told by their director that they would not be given PPE because there was a shortage, and that PPE equipment was reserved to care for patients who were known to be positive for COVID-19.

47.     Over the next week and a half, despite caring for many patients with symptoms consistent with COVID-19 and despite daily requests for PPE, Brown was not provided with *any* PPE equipment.  Montefiore did not provide any N95 respirators, even though N95 respirators were available in a locked closet in the clinic.  Brown and her colleague were also not given impermeable gowns, goggles, or face shields.

48.     On or about March 16, 2020, Brown began experiencing symptoms consistent with COVID-19, including a cough and fever.  She reported her symptoms to Montefiore and asked for testing.  She was informed that Montefiore would not test her and that testing was only offered to staff if the exposure was "significant."

49.     The next day, after Brown's symptoms worsened and she began to experience shortness of breath, body aches and significant fever, she obtained testing on her

own.  A few days later, she learned that she tested positive for COVID-19.  The other Nurse-Practitioner who worked alongside her had also tested positive.

50.     On or about March 30, when informed that she had tested positive, Montefiore told Brown that she should have returned to work seven days after her symptoms started.  Brown stated that she could not return to work because she still had significant shortness of breath and could not speak in full sentences.

51.     On or about April 2, Brown was diagnosed with double-lobe pneumonia caused by COVID-19.  Her doctor has placed her out of work until she recovers.

52.     Brown believes that she contracted COVID-19 due to her exposure at work and the lack of adequate PPE, as she had not come into contact with any other people she knew to have had the disease.

53.     Another example of particular concern is Montefiore's continuing treatment of nurses who work for the Home Health Agency.  These nurses, as the agency's name suggests, routinely visit several patients a day in the patient's home after the patient has been hospitalized and released.  Many of these patients have tested positive for COVID-19, were hospitalized, and sent home to recover.  If a nurse is only scheduled to see patients who have not yet tested positive for COVID-19, the nurse gets only a surgical mask, despite the fact that the patient or their family member may be suffering from COVID-19 symptoms.  If the nurse is scheduled to see patients who have tested positive for COVID-19, the nurse gets a single N95 respirator to be re-used for days and a face shield with a plastic sandwich bag with two or three wipes to clean the shield.  And the nurse has no proper place to don and doff such items so that disease-free areas do not become contaminated.  Many of these nurses have tested positive for COVID-19, and at least one has taken days off out of fear of infecting her elderly patients.

54.     Since the crisis began and continuing to date (with no end in sight) the RNs at Montefiore are treating large numbers of very sick patients, far beyond the staffing ratios set forth in the CBA.  At the risk of their health and that of their patients, the nurses are being forced to provide this care with inadequate and often ill-fitting equipment, often in rooms that have not been properly converted to deal with COVID-19 patients, often in practice areas where they have never been trained, and generally without adequate testing to ensure they are fit to work without infecting others.  Montefiore is directing nurses under quarantine/isolation orders or doctor attestations, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after seven days, regardless of whether the RN's symptoms had improved.  By being forced to return to work while they are still symptomatic and/or awaiting test results, Montefiore has endangered the health and safety of their co-workers and their patients.

55.     The Hospital's health and safety transgressions caused and continue to cause incalculable harm to the health and safety to both nurses and patients.  Such irreparable harm will continue to occur in the absence of injunctive relief.

The CBA

56.     At all relevant times, NYSNA and Montefiore have been parties to a collective bargaining agreement ("CBA") that sets forth the terms and conditions of employment of the nurses at the Bronx facilities.

57.     Article 11.03 of the CBA provides that the Hospital "will observe all applicable health and safety laws and regulations and will take steps necessary to assure employee health and safety."

58.     Article 13 of the CBA provides a four-step grievance procedure for resolving "every grievance" either party "may have with each other arising from application or

interpretation of this agreement."  The fourth and final step is arbitration before a neutral arbitrator selected by the parties.

The Grievance

59.     On April 14, 2020, NYSNA filed a grievance with the Hospital asserting a violation of Article 11.03 for Montefiore's persistent failure and refusal to take steps necessary to assure the nurses' health and safety.

60.     To date, Montefiore has failed to respond to the grievance.

**CLAIM FOR AN INJUNCTION**
**PENDING THE GRIEVANCE AND ARBITRATION**

61.     NYSNA repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

62.     NYSNA's grievance raises a dispute that is arbitrable under the CBA.

63.     NYSNA's grievance has merit under the CBA.

64.     NYSNA is likely to prevail on the merits of its grievance.

65.     In the absence of injunctive relief compelling Montefiore to take steps necessary to assure the health and safety of its nurses, the nurses will suffer irreparable harm to their health and safety.

66.     Montefiore will suffer relatively little to no harm in having to take steps necessary to assure the health and safety of its nurses.

67.     The public interest favors sparing the nurses, their families, and the general public the risks of COVID-19.

68.     For these reasons, the Court should issue an injunction pending resolution of the grievance.

69.     No prior application for similar relief has been made.

**WHEREFORE**, NYSNA respectfully request that this Court issue a Temporary Restraining Order and a Preliminary Injunction compelling Montefiore to take steps necessary to assure the nurses health and safety" including but not limited to:

1.      providing Personal Protective Equipment such as properly fitted protective N95 (or superior) masks, undamaged and clean face shields, and non-permeable gowns, in sufficient number so that they may be changed when needed;

2.      providing a secure space to don and doff such items so that disease-free areas in the hospital do not become contaminated;

3.      providing so-called "negative pressure rooms" so that disease-infected air does not linger or, at the very least, an adequate number of high-efficiency particulate air ("HEPA") filters;

4.      providing powered air-purifying respirator ("PAPR") suits for those employees whose physicality makes it difficult for them to work while wearing traditional masks;

5.      complying with the staffing ratios of the CBA, particularly with respect to patients on in the ICU and on ventilators;

6.      refraining from requiring the RNs to operate equipment on which they had not been trained, requiring the RNs to work outside their competencies, without adequate training, and requiring the RNs to perform tasks for which they do not have training and/or certification;

7.      enforcing the visitor policy;

8.      providing adequate coronavirus testing of RNs on demand, including antibody testing;

9.       refraining from directing RNs under quarantine/isolation orders or doctor attestations, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after seven days, regardless of whether the RNs' symptoms had improved; and

10.      reasonably accommodating nurses with underlying medical issues (such as autoimmune disorders or pregnancy) and providing the statutorily-protected leave or accommodations.

NYSNA also asks the Court to award the Union its attorneys' fees and costs; and other such relief as this Court deems just and proper.

Dated:  New York, New York
        April 20, 2020

Respectfully submitted,
COHEN, WEISS AND SIMON LLP

/s/ *Joseph J. Vitale*
Susan Davis
Joseph J. Vitale
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0238
sdavis@cwsny.com
jvitale@cwsny.com

Counsel for Plaintiff