UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

THE NEW YORK STATE NURSES
ASSOCIATION,

                              Plaintiff,

                    vs.

MONTEFIORE MEDICAL CENTER,

                              Defendant.

------------------------------------------------------------- x

: : : : : : : : : : :

Case No.

## MEMORANDUM OF LAW IN SUPPORT
## OF PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF

Susan Davis
Joseph J. Vitale
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0238
sdavis@cwsny.com
jvitale@cwsny.com

Counsel for Plaintiff

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

    The Parties ......................................................................................................................... 2

    The Coronavirus Pandemic ............................................................................................. 2

    Montefiore Fails to Take Steps to Assure the Nurses Health and Safety ........................... 7

    Nurse-Practitioner Pamella Brown-Richardson Is Denied PPE and Tests Positive
        for COVID-19 ....................................................................................................... 12

    The CBA .......................................................................................................................... 14

    The Grievance .................................................................................................................. 15

ARGUMENT ........................................................................................................................ 15

THE COURT SHOULD ISSUE IMMEDIATE AND PRELIMINARY INJUNCTIVE
    RELIEF .................................................................................................................. 15

I.      **NYSNA HAS SATISFIED THE STANDARD FOR A
        REVERSE *BOYS MARKETS* PRELIMINARY INJUNCTION** ................................ 15

      A.    **The Grievance Over Montefiore's Failure to Take Steps
            Necessary to Assure Employee Health and Safety Is Arbitrable** .................. 18

      B.    **The Grievance and Arbitration Process Will Be a
            "Hollow Formality" in the Absence of an Injunction** ...................................... 18

      C.    **NYSNA Satisfies the Traditional Factors for Injunctive Relief** .................... 19

            1.    **The Nurses Are Suffering Irreparable Harm** ...................................... 20

            2.    **NYSNA Will Likely Prevail on the Merits at Arbitration** ................. 21

            3.    **NYSNA's Arbitration Claim Raises Sufficiently Serious
                  Questions Going to the Merits to Make Them a Fair Ground
                  for Arbitration** ..................................................................................... 23̶2̶2

            4.    **The Balance of Equities Favors Issuance of a Preliminary
                  Injunction** ............................................................................................ 23

3041204.5

**II.    NYSNA IS ALSO ENTITLED TO A TEMPORARY RESTRAINING ORDER** .................................................................................................... 24

CONCLUSION ......................................................................................................... 24

3041204.5

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bakery Drivers Union, Local 802 v. S. B. Thomas, Inc*,
 No. 78-C 1270, 1978 WL 1654 (E.D.N.Y. June 21, 1978) ...............................................9, 15

*Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*,
 363 U.S. 528 (1960)........................................................................................................11

*Boys Markets, Inc. v. Retail Clerks Local 770*,
 398 U.S. 235 (1970)................................................................................................... *passim*

*Citizens Sec., Inc. v. Bender*,
 No. 19-CV-916 (MAD) (DJS), 2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019)........................16

*Constellium Rolled Prod. Ravenswood, LLC v. United Steelworkers Int'l Union*,
 No. 2:18-CV-01404, 2018 WL 6329748 (S.D.W. Va. Dec. 4, 2018) ................................8, 12

*DeWitt Stern Grp., Inc. v. Eisenberg*,
 No. 13 CIV. 3060 RWS, 2013 WL 2420835 (S.D.N.Y. June 4, 2013) ...................................9

*Drywall Tapers & Pointers of Greater New York, Local 1974 v. Operative
 Plasterers' & Cement Masons' Int'l Ass'n*,
 537 F.2d 669 (2d Cir. 1976)...............................................................................................12

*IBEW Local 2327 v. Consol. Commc'ns of N. New England Co., LLC*,
 No. 2:19-CV-265-NT, 2019 WL 7546601 (D. Me. Aug. 23, 2019).........................8, 9, 13, 15

*Int'l Dairy Foods Ass'n v. Amestoy*,
 92 F.3d 67 (2d Cir. 1996)...................................................................................................12

*Int'l Union, UAW v. Consol Energy, Inc.*,
 243 F. Supp. 3d 755 (S.D.W. Va. 2017).............................................................................8, 12

*Lever Bros. Co. v. Int'l Chem. Workers Local 217*,
 554 F.2d 115 (4th Cir. 1976) ............................................................................................8, 11

*Local Lodge 1266 v. Panoramic Corp.*,
 668 F.2d 276 (7th Cir. 1981) ............................................................................................8, 14

*Mastrio v. Sebelius*,
 768 F.3d 116 (2d Cir. 2014)...............................................................................................13

*Nat'l Post Office Mail Handlers v. USPS*,
 No. 78-0-68, 1978 WL 14027 (D. Neb. April 13, 1978) .........................................................14

3041204.5

*Niagara Hooker Emp. Union v. Occidental Chemical*,
    935 F.2d 1370 (2d Cir.1991) ................................................................................9, 10, 11

*Nursing Home & Hosp. Union 434 v. Sky Vue Terrace, Inc.*,
    759 F.2d 1094 (3d Cir. 1985) ..............................................................................................8

*Oil, Chem. & Atomic Workers Int'l Union, Local 2–286 v. Amoco Oil Co.*,
    885 F.2d 697 (10th Cir. 1989) .............................................................................................8

*Postal Workers Oakland Local v. United States Postal Serv.*,
    1981 WL 2383 (N.D. Cal. 1981) ........................................................................................13

*Rydelek v. Legal Aid Bureau of Buffalo, Inc.*,
    No. 98-CV-0098E(F), 1998 WL 135833 (W.D.N.Y. Mar. 10, 1998) ................................9, 10

*Teachers Ass'n of Japanese Educ. Inst. of New York, Inc. v. Japanese Educ. Inst.
    of New York*,
    724 F. Supp. 188 (S.D.N.Y. 1989) ............................................................................ *passim*

*Teamsters, Local Union No. 639 v. Airgas, Inc.*,
    239 F. Supp. 3d 906 (D. Md. 2017) ..............................................................................8, 14

*Texaco Indep. Union of Coraopolis Terminal v. Texaco, Inc.*,
    452 F. Supp. 1097 (W.D. Pa. 1978) ...................................................................................12

*United Steelworkers of Am. v. Am. Mfg. Co.*,
    363 U.S. 564 (1960) ...........................................................................................................14

*United Steelworkers of Am. v. Blaw-Knox Foundry & Mill Mach. Inc.*,
    319 F. Supp. 636 (W.D. Pa. 1970) .....................................................................................12

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*,
    363 U.S. 593 (1960) ...........................................................................................................14

*Valenzuela Arias v. Decker*,
    No.20-CV-2802 (AT), 2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) .............................12, 16

3041204.5

## PRELIMINARY STATEMENT

This is an action for an injunction pending arbitration.  The New York State Nurses Association ("NYSNA"), the labor union that represents 3,000 registered nurses employed by Defendant Montefiore Medical Center ("Montefiore" or the "Hospital"), last week initiated a grievance under the parties' collective bargaining agreement (the "CBA") challenging the Hospital's failure during the COVID-19 pandemic to "take steps necessary to assure employee health and safety" as required under the CBA.

By the time that grievance can be heard at arbitration and an award issues, it will be too late to remedy the harms caused by the Hospital's failure to comply with its contractual obligations, particularly the illnesses that the nurses will have already suffered.  NYSNA therefore seeks a reverse *Boys Markets* injunction to compel Montefiore to immediately take all steps required to protect the nurses' health and safety.

For frontline healthcare workers like the Montefiore nurses, precautions against COVID-19 should include: the provision of Personal Protective Equipment ("PPE") such as protective respirators and gowns, in sufficient number so that they may be changed when needed; a proper space to don and doff such items so that disease-free areas in the hospital do not become contaminated; so-called "negative pressure rooms" so that disease-infected air does not linger or, at the very least, an adequate number of high-efficiency particulate air ("HEPA") filters; coronavirus testing on demand; and other measures to preserve employees' physical and emotional health, including respecting their requests for statutorily-protected leave or accommodations.

To date, state-wide at least eight NYSNA RNs have died due to COVID-19 contracted at work, at least 84 NYSNA RNs have been hospitalized as a result of serious

COVID-19 symptoms, and at least 954 NYSNA RNs have tested positive for COVID-19, including at least 150 at Montefiore.

NYSNA estimates that state-wide up to up to 4,620 members could test positive during the course of the outbreak, 1,000 NYSNA RNs could be hospitalized during the course of the outbreak and 250 RNs could die.  Based on membership survey results, NYSNA estimates that at least another 150 RNs at Montefiore could test positive for COVID-19 unless the Hospital takes immediate steps to assure their health and safety.

Immediate injunctive relief is thus needed requiring Montefiore to take all steps necessary to maintain a safe and healthy workplace for the nurses.

## STATEMENT OF FACTS

The Parties

Plaintiff NYSNA is a union of approximately 42,000 frontline nurses standing together for strength at work, their practice, safe staffing, and healthcare for all.  NYSNA is New York's largest union and professional association for registered nurses and is the collective bargaining representative of registered nurses employed by the Hospital.  NYSNA represents approximately 3,000 nurses at the Montefiore Medical Center.  *See* Declaration of Marlena Fontes, dated April 19, 2020 ("Fontes Decl.") at ¶ 2.

Defendant Montefiore Medical Center is a private hospital operating several facilities, including Montefiore Medical Center (Moses Division), Jack D. Weiler Hospital of the Albert Einstein College of Medicine, Westchester Square Campus, Hutchinson Campus, and Montefiore Home Health Agency (hereinafter referred to as the "Bronx facilities").  *Id*. at ¶ 3.

The Coronavirus Pandemic

On March 11, 2020, the World Health Organization declared novel coronavirus, also known as COVID-19, a global pandemic.  *See* World Health Org., *WHO Director-General's*

- 2 -

*Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020).[1]  Since then, COVID-19

has swept across the United States, devastating both the public health and the economy.

New York State, which declared a state of emergency on March 7, 2020,[2] is the

epicenter of the pandemic.  As of April 15, more than 222,000 people have tested positive for

COVID-19, and more than 12,000 people have died from the virus.  *See* N.Y. Dep't of Health,

*COVID-19 Tracker* (last visited Apr. 16, 2020).[3]  New York State accounts for nearly half of the

deaths in the entire country.  *See* Centers for Disease Control & Prevention, *Coronavirus Disease*

*2019 (COVID-19): Cases in U.S.* (last visited Apr. 16, 2020).[4]

RNs have high risk, physically demanding jobs where they routinely confront

workplace violence, are obligated to lift heavy patients, and commonly experience other physical

stressors.  Further, RNs often face occupational exposure to serious infectious diseases such as

tuberculosis and influenza.  Because of these difficult working conditions, even prior to the

COVID-19 pandemic, nursing had one of the highest rates of occupational injury and illness of

any profession.  *See* Affidavit of Lisa Baum, dated April 17, 2020 ("Baum Aff.") at ¶ 5.

The methods by which the COVID-19 virus is transmitted and the troubling death

rate of this virus has created significant and persistent danger to RNs.  COVID-19 is transmitted

through three basic methods: (1) contact with a contaminated surface; (2) aerosolized droplets,

---

[1] *Available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] N.Y. Exec. Order 202, *Declaring a Disaster Emergency in the State of New York* (Mar. 7, 2020).

[3] *Available at* https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Map?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n (click "Fatality Data" in bottom right-hand corner to access information on fatalities).

[4]*Available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

- 3 -

which are secretions from coughing and sneezing; and (3) airborne particles.  Transmission of COVID-19 can occur from simply touching a contaminated surface at work, such as a computer at a nurses' station where reports are made, a bedrail, or a patient's tray.  RNs caring for COVID-19 patients, many of whom have a persistent and aggressive cough, are regularly exposed to aerosolized droplets.  Further, during medical procedures such as intubations, when COVID-19 patients are put on a ventilator to assist in breathing, the number of aerosolized droplets and the risk to RNs significantly increases.  Airborne particles are smaller and drier, so they travel farther and stay in the air longer.  The risk from airborne particles is particularly acute for RNs because, without proper ventilation, the air itself in a COVID-19 hospital unit can become contaminated and deadly.  *See* Baum Aff. at ¶ 6.

A recent CDC study dated April 14, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e6.htm?s_cid=mm6915e6_x, estimates that health care personnel constitute 19% of all COVID-19 cases in the United States, with at least 9,200 infected healthcare workers in the United States.  *See* Baum Aff. at ¶ 9.

NYSNA has compiled data tracking the horrendous toll the COVID-19 pandemic has taken on its RNs.  To date, state-wide at least eight NYSNA RNs have died due to COVID-19 contracted at work, at least 84 NYSNA RNs have been hospitalized as a result of serious COVID-19 symptoms, and at least 954 NYSNA RNs have tested positive for COVID-19, including at least 150 at Montefiore.  *See* Baum Aff. at ¶ 7.

NYSNA estimates that state-wide up to up to 4,620 members could test positive during the course of the outbreak, 1,000 NYSNA RNs could be hospitalized during the course of the outbreak and 250 RNs could die.  *See* Baum Aff. at ¶ 8.

- 4 -

The World Health Organization, the Centers for Disease Control and Prevention, and virtually every level of government have recognized that the only way to minimize casualties is to slow the disease's spread or, put differently, "flatten the curve."  Flattening the curve may be accomplished by restricting the movement of those not engaged in essential work, and for those who are, taking certain precautions to minimize their exposure to the disease.  Fontes Decl. at ¶ 13.

For frontline healthcare workers like the Montefiore nurses, such precautions should include: the provision of protective respirators and gowns, in sufficient number so that they may be changed when needed; a proper space to don and doff such items so that disease-free areas in the hospital do not become contaminated; so-called "negative pressure rooms" so that disease-infected air does not linger or, at the very least, an adequate number of high-efficiency particulate air ("HEPA") filters; coronavirus testing on demand; and other measures to preserve employees' physical and emotional health, including respecting their requests for statutorily-protected leave or accommodations.  *See* Baum Aff.  at ¶¶ 15-24.

NYSNA Attempts to Work with Montefiore

Even before it became clear to many government leaders that the COVID-19 crisis would place unprecedented and severe burdens on New York's nurses, NYSNA sprang into action.  Since January 2020, NYSNA has attempted to work with the Hospital, so as to prepare for the COVID-19 crisis, in which patients received care while Montefiore maintained a safe and healthy workplace for the nurses.  Sadly NYSNA's efforts have been largely rebuffed or ignored by the Hospital.  Fontes Decl. ¶ 15.

Once a month, NYSNA and the Hospital hold a Labor-Management meeting.  On the same day as that meeting, NYSNA and the Hospital also hold a Health and Safety meeting. *Id.* at ¶ 16.

On February 5, 2020, it was NYSNA, not Montefiore, that asked to devote the Health and Safety meeting on February 14 to discussing the environmental, health and safety precautions that could be taken to confront the coronavirus and flu surge.  NYSNA also asked that given the important nature of this discussion, all management personnel involved in health, safety and environmental/infection control issues should be present.  *Id.* at ¶ 17.

On February 7, 2020, in an effort to successfully contain the spread of the virus and protect NYSNA members and the public, NYSNA requested Montefiore produce information regarding it preparedness related to the care of COVID-19 patients and those patients under investigation for COVID-19.  The Hospital responded seventeen days later on February 24.  Its response was incomplete and demonstrated just how poorly prepared Montefiore was.  *Id.* at ¶ 18.

At the March 13, 2020 Labor-Management meeting and Health and Safety meetings, NYSNA asked that all future meetings be devoted to COVID-19 issues and that the parties immediately begin to hold conference calls once a day with the Hospital's upper management to discuss COVID-19 concerns.  It took a week for the Hospital to agree to such calls.  In the week interim, Montefiore held only facility-specific calls with that facility's management.  *Id.* at ¶ 19.

At the March 13, 2020 Labor-Management meeting, NYSNA also urged Montefiore to immediately adopt a series of measures necessary to assure the health and safety of nurses.  For instance, NYSNA insisted that N95 respirators (or better) and other PPE should be used for all patients under investigation for COVID-19 or confirmed COVID-19 cases. Montefiore resisted this request and responded that N95 respirators should be used only in

- 6 -

limited circumstances for aerosol-generating procedures or for patients on airborne isolation.  *Id.* at ¶ 20.

At the March 13, 2020 Labor-Management meeting, NYSNA repeated a request the Union first made in February—that Montefiore immediately erect tents outside the Emergency Departments of each facility for pre-screening and cohorting patients so that patients could be screened for COVID-19 before entering the Hospital and infecting the nurses and others.  Montefiore did so only belatedly, after other hospitals had already taken such measures. *Id.* at ¶ 21.

At the March 13, 2020 Labor-Management meeting, NYSNA had numerous other suggestions that either got rejected or belatedly accepted.  *Id.* at ¶ 22.

Montefiore continues to resist cooperating with NYSNA.  On April 16, 2020, NYSNA and Montefiore had their daily call to address RNs' health and safety concerns. Management could not answer numerous health and safety questions regarding ventilation, saying they would refer the questions to their health and safety officer Jared Shapiro.  Despite NYSNA's prior requests, Shapiro was not on the call April 16, and Montefiore has yet to agree to the Union's request that he join our daily calls.  As of today, NYSNA has yet to receive an answer to its questions.  *Id.* at ¶ 23.

<u>Montefiore Fails to Take Steps to Assure the Nurses' Health and Safety</u>

Instead of implementing well-established polices, many endorsed by OSHA, that would keep its nurses (and, by extension, their patients and the public at large) safe, Montefiore management through its actions and inactions has created and allowed to flourish a number of severe and pervasive workplace hazards that are causing or are likely to cause the RNs death or serious physical harm.  Fontes Decl. at ¶ 30.

- 7 -

Right now, the Hospital is like a war zone.  The RNs there are treating large numbers of very sick and frightened patients, far beyond the staffing ratios set forth in the CBA. At the risk of their health and that of their patients, the nurses are being forced to provide this care with inadequate and often ill-fitting equipment, often in rooms that have not been properly converted to deal with COVID-19 patients, often in practice areas where they have never been trained, and generally without adequate testing to ensure they are fit to work without infecting others.  Montefiore is directing nurses under quarantine/isolation orders or doctor attestations, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after seven days, regardless of whether the RNs' symptoms had improved.  By being forced to return to work while they are still symptomatic and/or awaiting test results, Montefiore has endangered the health and safety of their co-workers and their patients.  Fontes Decl. at ¶ 27.

In order to safely care for COVID-19 patients, RNs must have respirators that protect them from both aerosolized droplets and smaller airborne particles.  Surgical masks are not respirators and are not effective in protecting RNs from aerosolized droplets and airborne particles from COVID-19 patients.  The normal standard of care in the United States is that disposable N95 respirators must be discarded after each patient care session.  Baum Aff. at ¶ 15.

Effective, reusable respirators are powered air purifying respirators ("PAPRs") and elastomeric cartridge filter respirators.  OSHA directs that health care facilities first explore using reusable respirators, such as PAPRs and elastomeric cartridge filter respirators, prior to reusing disposable N95 respirators.  Baum Aff. at ¶¶ 15, 17.

OSHA requires health care facilities to fit-test the model and size of the N95 respirators that they distribute to RNs.  Fit-testing is a process where a technician measures whether there is a tight seal between the respirator and an RN's face.  If there is no tight seal,

- 8 -

contaminated air can seep in through the side of the respirator and endanger the RN.  There are different models and sizes of N95 respirators and, if an RN fails a fit-test on one size or model, it is imperative, in order to protect the RN's health and life, that the employer continue fit-testing with different sizes and models until there is a proper fit.  Baum Aff. at ¶ 19.

Montefiore, in stark contrast, is either not providing the nurse a N95 respirator or provides one that has not been fit-tested to ensure an adequate seal.  If Montefiore does provide a N95 respirator, the Hospital requires the nurse to use the same N95 respirator while caring for numerous patients.  If that N95 gets damaged or soiled, there is often a delay in providing a replacement.  The Hospital is also not providing the nurse with an undamaged and clean face shield.  The nurses must clean the face shield themselves, but the Hospital is not providing the RNs proper disinfectant supplies consistently obtainable.  Fontes Decl. at ¶ 35.

To protect against COVID-19, it is essential that Montefiore provide RNs with fluid-resistant or impermeable gowns and/or body covering that is changed every time a RN treats an infectious patient.  This is a serious infection control concern, which could result in new COVID-19 infections of patients, RNs, their families and their communities.  Baum Aff. at ¶ 22.

But Montefiore is either not providing its RNs with an impenetrable or fluid resistant gown, along with underclothing consisting of a head, neck, torso and foot covering, or if the Hospital does provide a gown, it requires the nurses to use the same gown while caring for numerous patients.  The Hospital sometimes provide a gown with an open back, which increases the nurse's exposure to COVID-19.  All of this is a serious infection control concern that could result in new COVID-19 infections of patients, RNs, their families and their communities.  Fontes Decl. at ¶ 37.

The Hospital is repeatedly exceeding, by large margins, the staffing ratios of the CBA.  As a result, nurses are physically and emotionally suffering from the enormous pressure and anxiety as they attempt to care for more patients than can reasonably be expected.  If anything, the fragile condition of COVID-19 patients requires greater, not less, attention and care than the usual patient.  Fontes Decl. at ¶ 38.

Montefiore is requiring nurses to operate equipment on which they had not been trained, requiring nurses to work outside their competency (without adequate training), requiring nurses to perform a task for which they do not have training and/or certification.  Fontes Decl. at ¶ 39.

Montefiore unreasonably delayed in adopting a visitor policy that is sufficiently strict to assure the health and safety of nurses and patients.  NYSNA raised concerns about the policy with Montefiore on both the February 14, 2020 and March 13, 2020, but it was not until late March that the Hospital sufficiently restricted its visitor policy.  But the Hospital is not even uniformly enforcing the visitor policy it did adopt.  Fontes Decl. at ¶ 40.

It is a major public health problem if RNs do not know their COVID-19 status, as they will inevitably unknowingly infect others.  Indeed, an employer that does not know which employees are COVID-19 positive will not be able to conduct an adequate health and safety risk assessment for the rest of their staff and their patients.  Baum Aff. at ¶ 25.  But Montefiore is not providing adequate testing of nurses on demand, including antibody testing.  Fontes Decl. at ¶ 41.

In order to safely remove PPE after use, a space must be used (or created) that allows PPE to be doffed without contaminating "clean" areas.  Negative pressure rooms often are designed with antechambers that accomplish this goal.  Space can also be created using

- 10 -

prefabricated portable units or creating spatial divisions using fire-rated plastic with zippers. These are frequently set up in hospitals when construction work is being conducted. Baum Aff. at ¶ 23.

Montefiore is not providing an adequate designated changing area for donning and doffing PPE, including gowns. As a result of the lack of adequate donning and doffing space, there is a risk that non-COVID-19 areas can become contaminated, again needlessly putting RNs and non-COVID-19 patients at risk. Fontes Decl. at ¶ 43.

It is a long-standing practice in healthcare to use negative air pressure rooms to care for infectious patients with airborne and droplet transmissible illnesses. When done properly, this engineering control reduces the risk of a virus traveling into other areas and, by rapidly exhausting and exchanging air in an area, it reduces airborne levels of COVID-19, thus reducing the risk of staff exposure. As per CDC recommendations, facilities can quickly create additional negative air pressure, HEPA filtered areas for the care of COVID-19 patients. Baum Aff. at ¶ 24. Despite this clear CDC guidance, however, Montefiore either have not done so, done so on only a limited basis, or done so in ways that the rooms or areas did not function properly. Fontes Decl. at ¶ 44.

Members of the general public are directed to self-quarantine for 14 days, and if their employer has 100 or more employees, receive sick pay to recover during this period. The 14-day standard for isolation after testing positive for COVID-19 exists in order to safeguard the public and prevent the spread of the disease. Baum Aff. at ¶ 13.

However, Montefiore is directing nurses under quarantine/isolation orders or doctor attestations, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after seven days, regardless of whether the RNs' symptoms had

improved.  By being forced to return to work while they are still symptomatic and/or awaiting

test results, Montefiore has endangered the health and safety of their co-workers and their

patients.  For example, RNs with respiratory symptoms such as shortness of breath, may not be

able to safely wear a N95 respirator required to care for COVID-19 patients.  Fontes Decl. at

¶ 46.

Montefiore is similarly making it difficult for nurses seeking reasonable

accommodations for their underlying medical conditions (such as autoimmune disorders and

pregnancy).  Fontes Decl. at ¶ 47.

Nurse-Practitioner Pamella Brown-Richardson
<u>Is Denied PPE and Tests Positive for COVID-19</u>

Just one example of the many ways Montefiore is failing to assure nurses' safety

is that of Nurse-Practitioner Pamela Brown-Richardson.  On or about March 8, 2020, she and a

colleague began seeing patients with COVID-19 symptoms.  At this time, she and the other

Nurse-Practitioner began requesting that Montefiore provide them with PPE to protect

themselves from exposure to COVID-19.  Brown-Richardson and her colleague were told by

their director that they would not be given PPE because there was a shortage and that PPE

equipment was reserved to care for patients who were known to be positive for COVID-19.

Affidavit of Pamella Brown-Richardson, dated April 17, 2020 ("Brown Aff.") at ¶¶ 1, 3-4.

Over the next week and a half, despite caring for many patients with symptoms

consistent with COVID-19 and despite daily requests for PPE, Brown was not provided with *any*

PPE equipment.  Montefiore did not provide any N95 respirators, even though N95 respirators

were available in a locked closet in the clinic.  Brown and her colleague were also not given

impermeable gowns, goggles, or face shields.  *Id.* at ¶ 5.

- 12 -

On or about March 16, 2020, Brown began experiencing symptoms consistent with COVID-19, including a cough and fever.  She reported her symptoms to Montefiore and asked for testing.  She was informed that Montefiore would not test her and that testing was only offered to staff if the exposure was "significant."  *Id.* at ¶ 6.

The next day, after Brown's symptoms worsened and she began to experience shortness of breath, body aches and significant fever, she obtained testing on her own.  A few days later, she learned that she tested positive for COVID-19.  The other Nurse-Practitioner who worked alongside her had also tested positive.  *Id.* at ¶¶ 6-7.

On or about March 30, when informed that she had tested positive, Montefiore told Brown that she should have returned to work seven days after her symptoms started.  Brown stated that she could not return to work because she still had significant shortness of breath and could not speak in full sentences.  *Id.* at ¶ 8.

On or about April 2, Brown was diagnosed with double-lobe pneumonia caused by COVID-19.  Her doctor has placed her out of work until she recovers.  Brown believes that she contracted COVID-19 due to her exposure at work and the lack of adequate PPE, as she had not come into contact with any other people she knew to have had the disease.  *Id.* at ¶¶ 9-10.[5]

---

[5] Other examples of Montefiore's failings include Benny Mathew and Geraldine Phelan-Beecher.  Mathew is staff nurse at Montefiore's Moses Campus in the Adult Emergency Department, who was denied PPE, tested positive for COVID-19, and directed to return to work three days after testing positive.  Geraldine Phelan-Beecher is a RN at the Moses Division who was not given the proper PPE, then tested positive for COVID-19, and is being instructed to return to work as soon as she has no fever for three days, regardless of her other acute COVID-19 symptoms.  Phelan-Beecher was prepared to submit her own affidavit but on April 17 was too ill (coughing and running a fever) to do so.  Affidavit of Benny Mathew dated April 17, 2020; Fontes Decl. ¶ 49.

Home Health Agency Nurses Are
<u>Sent Into Patient Homes Unprotected</u>

Of particular concern is Montefiore's treatment of nurses who work for the Home

Health Agency.  These nurses, as the agency's name suggests, routinely visit several patients a

day in the patient's home after the patient has been hospitalized and released.  Fontes Decl. at

¶ 53.

Many of these patients have tested positive for COVID-19, were hospitalized, and

sent home to recover.  *Id.*

If a nurse is scheduled to see only patients who have not tested positive for

COVID-19, the nurse gets no PPE, despite the fact that the patient or their family member may

be suffering from COVID-19 symptoms.  *Id*.

If the nurse is scheduled to see patients who have tested positive for COVID-19,

the nurse gets a single N95 respirator to be re-used and a face shield with a plastic sandwich bag

of two or three wipes to clean the shield.  *Id.*

And the nurse has no proper place to don and doff such items so that disease-free

areas do not become contaminated.  *Id.*

Many of these nurses have tested positive for COVID-19 and at least one has

taken days off out of fear of infecting her elderly patients.  *Id.*

The CBA Requires the Hospital to Take Steps
<u>Necessary to Assure Employee Health and Safety</u>

At all relevant times, NYSNA and Montefiore have been parties to a collective

bargaining agreement ("CBA") that sets forth the terms and conditions of employment of the

nurses at the Bronx facilities.  Fontes Decl. ¶ 24 and Exhibits 1 and 2 thereto.

- 14 -

Article 11.03 of the CBA provides that the Hospital "will observe all applicable health and safety laws and regulations and will take steps necessary to assure employee health and safety." *Id.* at ¶ 25.

Article 13 of the CBA provides a four-step grievance procedure for resolving "every grievance" either party "may have with each other arising from application or interpretation of this agreement." The fourth and final step is arbitration before a neutral arbitrator selected by the parties. *Id.* at ¶ 26.

The Grievance

On April 14, 2020, NYSNA filed a grievance with the Hospital asserting a violation of Article 11.03 for Montefiore's persistent failure and refusal to take steps necessary to assure the nurses' health and safety. To date, Montefiore has failed to respond to the grievance. Fontes Decl. at ¶¶ 55-56 and Exhibit 3 thereto.

## ARGUMENT

### THE COURT SHOULD ISSUE IMMEDIATE AND PRELIMINARY INJUNCTIVE RELIEF

**I.   NYSNA HAS SATISFIED THE STANDARD FOR A REVERSE *BOYS MARKETS* PRELIMINARY INJUNCTION**

Although the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, generally bars injunctions in labor disputes, in *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235 (1970), the Supreme Court held that a federal district court can, and should, issue an injunction to protect the integrity of the arbitration process. In *Boys Markets*, the Court held that a union could be enjoined from striking in violation of a collective bargaining agreement's no-strike provision, when the agreement also provides for binding arbitration of the dispute that prompted the strike. *Id.* at 254.

- 15 -

Courts subsequently applied this principle of protecting the arbitration process to issue "reverse *Boys Markets*" injunctions to prevent an employer from taking an action that arguably violates the collective bargaining agreement when the union seeks to resolve the dispute by arbitration. *See, e.g.*, *Oil, Chem. & Atomic Workers Int'l Union, Local 2-286 v. Amoco Oil Co.*, 885 F.2d 697, 709 (10th Cir. 1989) (affirming lower court's enjoining of implementation of drug testing program pending arbitration); *Nursing Home & Hosp. Union 434 v. Sky Vue Terrace, Inc.*, 759 F.2d 1094, 1098 (3d Cir. 1985) (affirming lower court's order enjoining employer from distributing funds derived from the sale of its business assets pending arbitration); *Local Lodge 1266 v. Panoramic Corp.*, 668 F.2d 276, 283 (7th Cir. 1981) (affirming lower court's enjoining of sale of corporate assets pending arbitration; *Lever Bros. Co. v. Int'l Chem. Workers Local 217*, 554 F.2d 115, 122 (4th Cir. 1976) (affirming lower court's enjoining of transfer of operations pending arbitration); *IBEW Local 2327 v. Consol. Commc'ns of N. New England Co., LLC*, No. 2:19-CV-265-NT, 2019 WL 7546601, at *1 (D. Me. Aug. 23, 2019) (enjoining sale of unit that employed union members pending arbitration); *Constellium Rolled Prod. Ravenswood, LLC v. United Steelworkers Int'l Union,* No. 2:18-CV-01404, 2018 WL 6329748, at *4 (S.D. W.Va. Dec. 4, 2018) (enjoining termination of health insurance coverage pending arbitration); *Int'l Union, UAW v. Consol Energy, Inc.*, 243 F.Supp.3d 755, 764 (S.D. W.Va. 2017) (same); *Teamsters, Local Union No. 639 v. Airgas, Inc.*, 239 F.Supp.3d 906, 912 (D. Md. 2017) (enjoining relocation of operations pending arbitration); *Teachers Ass'n of Japanese Educ. Inst. of New York, Inc. v. Japanese Educ. Inst. of New York*, 724 F.Supp. 188, 191 (S.D.N.Y. 1989) (enjoining employer from altering format of monthly meetings with faculty pending arbitration of faculty grievance that changed format violates CBA); *Bakery Drivers*

- 16 -

*Union, Local 802 v. S. B. Thomas, Inc*, No. 78-C 1270, 1978 WL 1654, at *4 (E.D.N.Y. June 21, 1978) (enjoining employer's restructuring of routes pending arbitration).

To obtain a reverse *Boys Markets* injunction, a union must show three things: (1) that the dispute is arbitrable; (2) that the arbitration process will be a "hollow formality" in the absence of an injunction; and (3) the "traditional factors" for issuance of equitable relief:  that irreparable harm and either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief (*i.e.,* the harm the union or its members will suffer absent an injunction outweighs the harm to the employer if the employer's conduct is enjoined).  *See Niagara Hooker Emp. Union v. Occidental Chemical*, 935 F.2d 1370, 1377 (2d Cir.1991) (setting forth standard); *DeWitt Stern Grp., Inc. v. Eisenberg*, No. 13 CIV. 3060 RWS, 2013 WL 2420835, at *3 (S.D.N.Y. June 4, 2013) (standard for traditional factors); *Rydelek v. Legal Aid Bureau of Buffalo, Inc.*, No. 98-CV-0098E(F), 1998 WL 135833, at *1 (W.D.N.Y. Mar. 10, 1998) (setting forth standard); *Teachers Ass'n of Japanese Educ. Inst. of New York,* 724 F.Supp. at 191.[6]

As described below, these factors provide ample grounds for issuance of a preliminary injunction against Montefiore.

---

[6] The usual additional factor—the injunction would be in the public interest—requires no further inquiry given the national policy in favor of arbitration.  *Int'l Bhd. of Elec. Workers, Local 2327,* 2019 WL 7546601, at *3 (recognizing that in "the *Boys Markets* environment, arbitrability replaces the fourth factor [of the injunctive relief test] entirely"); *see also Boys Markets*, 398 U.S. at 253 (emphasizing national policy in favor of arbitration).

**A.      The Grievance Over Montefiore's Failure to Take Steps
Necessary to Assure Nurses' Health and Safety Is Arbitrable**

There is no possible disagreement that NYSNA's grievance is arbitrable, *i.e.,* that the underlying dispute is subject to arbitration under the parties' CBA.

Article 11.03 of the CBA provides that the Hospital "will observe all applicable health and safety and regulations *and will take steps necessary to assure employee health and safety*." (Emphasis added).

Article 13 of the CBA provides a four-step grievance procedure for resolving "every grievance" either party "may have with each other *arising from application or interpretation of this agreement*." (Emphasis added).  The fourth and final step is arbitration before a neutral arbitrator selected by the parties.

Here, NYSNA's grievance directly concerns the "application" and "interpretation" of the Hospital's obligations under Article 11.03 of the CBA.  Indeed, as a matter of law, when a CBA contains an arbitration clause, disputes under the CBA are "presumed to be arbitrable."  *Niagara Hooker Emp. Union*, 935 F.2d at 1375; *see also Rydelek*, 1998 WL 135833, at *1 (finding dispute arbitrable under terms of CBA but denying injunction requiring employer to restore employee to "intake" assignment where "experience" lost was not irreparable and could be acquired in future assignment).

The grievance thus raises a dispute that is arbitrable.

**B.      The Grievance and Arbitration Process Will Be a
"Hollow Formality" in the Absence of an Injunction**

A reverse *Boys Markets* injunction is warranted "when the employer's action has the effect of frustrating the arbitral process, or rendering it a 'hollow formality.'" *Niagara*

- 18 -

*Hooker Employees Union*, 935 F.2d at 1377 (*quoting Lever Bros*, 554 F.2d at 123).[7]  Such is the case when an "arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction." *Id.* at 1378.

The goal of reverse *Boys Markets* injunction is to avoid an outcome at arbitration that is "empty victory."  *Teachers Ass'n of Japanese Educ. Inst. of New York,* 724 F.Supp. at 192 (*quoting Bhd. of Locomotive Engineers v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 534 (1960)).

Here, NYSNA's grievance concerns matters of life and death.  An arbitrator will not be able to go back in time and protect nurses from illness that result from inadequate safety measures by Montefiore that lead to exposure to COVID-19.  The arbitrator cannot prevent the contraction of the virus, or the possible death from the virus, or complications thereof.  The arbitrator also cannot go back and prevent the spread of the virus to those in the community the nurses come into contact with, and prevent contraction of the virus by those individuals.

C.    **NYSNA Satisfies the Traditional Factors for Injunctive Relief**

As shown below, NYSNA satisfies the "traditional factors" for issuance of injunctive relief:  irreparable harm and either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief (*i.e.*, the harm the union or its members will suffer absent an injunction outweighs the harm to the employer if the employer's conduct is enjoined).

---

[7] In *Niagara Hooker Employees Union*, the court concluded that the employer could continue to perform random drug tests while an arbitration challenging such tests proceeded without rendering arbitration a hollow formality since the arbitrator could reinstate any employees terminated for testing positive.

- 19 -

1.       **The Nurses Are Suffering Irreparable Harm**

A preliminary injunction is needed because the failure to provide a safe work environment is causing nurses irreparable harm.

"Irreparable harm" is an injury for which a monetary award cannot be adequate compensation." *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996).

Here, no amount of money can properly compensate the NYSNA nurses who will risk their lives daily from exposure to COVID-19 while waiting for an arbitrator to decide if the employer should be forced to provide them with the life-saving PPE they need to prevent contracting and spreading COVID-19.

Indeed, just days ago, on April 10, 2020, this Court in *Valenzuela Arias v. Decker*, No. 20-CV-2802 (AT), 2020 WL 1847986, at *2 (S.D.N.Y. Apr. 10, 2020), granted a TRO that released detainees with underlying medical conditions that risked death or serious injury if exposed to COVID-19.  This Court held that the continued detention of plaintiffs in the Essex County Jail posed a serious threat to their health.  Even though the Jail took some steps to mitigate the spread of COVID-19, the Court found that the risk to plaintiffs was nonetheless "still very real."  *Id.* at *4.  *See also Texaco Indep. Union of Coraopolis Terminal v. Texaco, Inc.*, 452 F.Supp. 1097, 1107 (W.D. Pa. 1978) (recognizing that "a real and imminent threat to the safety of employees would also be a sufficient cause for issuance of an injunction because no arbitration award could compensate for loss of life or physical injury."); *United Steelworkers of Am. v. Blaw-Knox Foundry & Mill Mach. Inc.*, 319 F.Supp. 636, 640-42 (W.D. Pa. 1970) (physical harm and risk of bodily injury is irreparable harm that warrants a preliminary injunction); *Constellium Rolled Prod. Ravenswood, LLC*, 2018 WL 6329748, at *4 (S.D. W.Va. Dec. 4, 2018) (enjoining termination of health insurance coverage pending arbitration); *Int'l Union v. Consol Energy, Inc.*, 243 F.Supp.3d 755, 764 (S.D. W.Va. 2017) (same); *Drywall*

- 20 -

*Tapers & Pointers of Greater New York, Local 1974 v. Operative Plasterers' & Cement Masons' Int'l Ass'n,*, 537 F.2d 669, 675 (2d Cir. 1976) (granting injunction in jurisdictional dispute between unions because of irreparable harm in "loss of bargained-for benefits (safety conditions, benefits and wages were being diminished under 'sweetheart' contracts negotiated by" defendant union); *Postal Workers Oakland Local v. United States Postal Serv.*, 1981 WL 2383, at *2 (N.D. Cal. 1981) (enjoining employer's removal of rest bars from work station enjoined); *Teachers Ass'n of Japanese Educ. Inst. of New York,* 724 F.Supp. at 193 (enjoining a change in the format of faculty-administration meetings pending arbitration because a "meeting already held … presents an arbitrator with a deed already done.  The inability to recreate the discussion that would or should have been constitutes the irreparable harm.").

Here, the nurses will suffer irreparable harm as they risk their lives daily from exposure to COVID-19 if Montefiore does not provide them with the life-saving PPE and take other safety measures that the nurses so desperately need.  *See Mastrio v. Sebelius*, 768 F.3d 116, 120-21 (2d Cir. 2014) (rejecting defendant's argument that an injunction improperly altered the status quo because it required the defendant to restore health benefits the defendant had already ceased providing, the court explains that the "'status quo'" to be preserved by a preliminary injunction is the last actual, peaceable uncontested status which preceded the pending controversy").

### 2.   <u>NYSNA Will Likely Prevail on the Merits at Arbitration</u>

NYSNA easily satisfies the likelihood of prevailing on the merits, as that standard is relaxed in reverse *Boys Markets* cases.

Given the national labor policy in favor of arbitration, the courts refrain from inquiring into the merits of the grievance other than to determine that the grievance is not futile. *IBEW Local 2327*, 2019 WL 7546601, at *2 ("Because 'a requirement that the plaintiff show a

- 21 -

likelihood of prevailing on the merits of its grievance would intrude significantly on the arbitrator's function,' courts have found that the likelihood of success prong is satisfied for the purposes of a reverse *Boys Markets* injunction when the plaintiff's position 'is sufficiently sound to prevent the arbitration from being a futile endeavor.'" (*quoting Panoramic Corp.*, 668 F.2d at 284-85)); *see United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) ("[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator"); *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960) ("The courts … have no business weighing the merits of the grievance"); *Airgas*, 885 F.3d at 234 ("As to likelihood of success on the merits … because the merits of the contract dispute are reserved to the arbitrator, the relevant inquiry is limited to whether the parties' dispute is subject to arbitration"); *Nat'l Post Office Mail Handlers v. USPS*, No. 78-0-68, 1978 WL 14027, at *4 (D. Neb. April 13, 1978) (policy against judicial interference in labor disputes means that test for likelihood of success on the merits is only whether "union has raised sufficiently serious questions on the merits to present an arbitrable controversy").

Even if the Hospital were to contend that NYSNA must show its grievance has merit, NYSNA satisfies this standard as well.  Montefiore's treatment of Nurse-Practitioner Pam Brown and the Home Health Agency nurses can by no stretch of the imagination be viewed as taking the necessary steps to assure their health and safety.  They are just two examples of the Hospital's many failings.

Thus, even if the Court were to consider the merits of NYSNA's arbitration claim, it would have no basis to conclude that the claim lacks substance.

### 3.     NYSNA's Grievance Raises Sufficiently Serious Questions <u>Going to the Merits to Make Them a Fair Ground for Arbitration</u>

As just shown, the standard for showing a likelihood of success is a relaxed one, and in any event NYSNA can show a likelihood of success on the merits.

However, even if the Court were to conclude that NYSNA's success at arbitration is not likely, at the very least, for the reasons stated above, NYSNA's grievance raises serious questions going to the merits.  A preliminary injunction is thus warranted if the balance of the equities is in the Union's favor.  NYSNA will now show that the balance is decidedly in the nurses' favor.

### 4.     The Balance of Equities Favors <u>Issuance of a Preliminary Injunction</u>

Here, the harm the nurses will suffer absent an injunction outweighs the harm, if any, to the Hospital if injunction is granted.  Indeed, NYSNA is hard-pressed to discern any harm to the Hospital, other than perhaps the relatively modest cost of supplying PPE, if the injunction is granted.

The balance of the equities therefore clearly weighs in favor of a preliminary injunction.  *See, e.g.*, *IBEW Local 2327*, 2019 WL 7546601, at *3 (permanent loss of bargaining unit outweighed employer's financial losses during the run of the injunction); *Teachers Ass'n of Japanese Educ. Inst. of New York*, 724 F.Supp. at 193; *Bakery Drivers Union, Local 802*, 1978 WL 1654, at *6.

In sum, the harms being suffered by the nurses far outweigh whatever conceivable harm the Hospital may experience from having to provide a safe workplace until the grievance is resolved.[8]

---

[8] As stated above, the usual fourth factor—the injunction would be in the public interest—is satisfied by the national policy in favor of arbitration.  *See supra* n.6.  It is nonetheless also very

## II.      NYSNA IS ALSO ENTITLED TO A TEMPORARY RESTRAINING ORDER

The standard for entry of a temporary restraining order is the same as for a

preliminary injunction.  *Valenzuela Arias v. Decker*, No. 20-CV-2802 (AT), 2020 WL 1847986,

at *2 (S.D.N.Y. Apr. 10, 2020) (granting TRO); *Citizens Sec., Inc. v. Bender*, No. 19-CV-916

(MAD) (DJS), 2019 WL 3494397, at *2 (N.D.N.Y. Aug. 1, 2019) (granting TRO).

As shown above, the nurse will suffer irreparable harm as long as the Hospital

fails to take all steps necessary to assure the nurses' health and safety.

Those steps need to begin now, pending the issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court should issue a Temporary Restraining Order

and a Preliminary Injunction requiring Montefiore to all steps necessary to assure the nurses'

health and safety, including but not limited to:

- providing Personal Protective Equipment such as properly fitted protective
  respirators, undamaged and clean face shields, and gowns, in sufficient
  number so that they may be changed when needed;

- providing a proper space to don and doff such items so that disease-free areas
  in the hospital do not become contaminated;

- providing so-called "negative pressure rooms" so that disease-infected air
  does not linger or, at the very least, an adequate number of high-efficiency
  particulate air ("HEPA") filters;

- complying with the staffing ratios of the CBA;

- refraining from requiring an RN to operate equipment on which they had not
  been trained, requiring the RN to work outside their competency, without

_____

much in the public interest that Montefiore take all steps necessary to protect nurse, patients,
their families and members of the general public from COVID-19.

- 24 -

adequate training, and requiring an RN to perform a task for which they do not have training and/or certification;

- strictly enforcing the visitor policy;

- providing adequate coronavirus testing of the RN on demand, including antibody testing;

- refraining from performing elective procedures;

- refraining from directing a RN under quarantine/isolation order or doctor attestation, or who otherwise reported having COVID-19 symptoms, to use their own sick bank and/or return to work after 7 days, regardless of whether the RN's symptoms had improved; and

- reasonably accommodating nurses with underlying medical conditions (such as autoimmune disorders and pregnancy).

Dated:  New York, New York
        April 20, 2020

Respectfully submitted,

COHEN, WEISS AND SIMON LLP

/s/ *Joseph J. Vitale*
Susan Davis
Joseph J. Vitale
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone: (212) 356-0238
sdavis@cwsny.com
jvitale@cwsny.com

Counsel for Plaintiff

- 25 -

3041204.5