UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
                                                              :
                                                              :
THE NEW YORK STATE NURSES                                     :
ASSOCIATION,                                                  :
                                                              :
                          Plaintiff,                          :  Case No.
                                                              :
              vs.                                             :
                                                              :
MONTEFIORE MEDICAL CENTER,                                    :
                                                              :
                          Defendant.                          :
                                                              :
                                                              :
------------------------------------------------------------- x


**AFFIDAVIT OF**

**LISA BAUM**

## AFFIDAVIT OF LISA BAUM

STATE OF NEW YORK        }

                             } ss.:

COUNTY OF NEW YORK    }

Lisa Baum, being of full age and duly sworn, affirms as follows:

1.      I am currently employed as the Lead Occupational Health & Safety Representative at New York State Nurses Association ("NYSNA"). NYSNA is a labor union that represents approximately 42,000 Registered Nurses ("RNs") across New York State. I have worked in this role since June 2014. Prior to working for NYSNA, I was a health and safety representative at District Council 37 for 16 years.

2.      I have a MA degree from New York University and two national occupational health and safety certifications: Certified Safety Professional ("CSP") and Certified Safe Patient Handling Associate ("CSPHA").

3.      My duties include conducting workplace health and safety inspections, advocating for the health and safety of RNs with hospital management, training on a variety of occupational health and safety issues relevant to health care workers, and providing technical expertise on health and safety issues. Further, for many years I have managed large grants from the New York State Department of Labor Hazard Abatement Board, which are used to provide safety and health education and training to NYSNA members.

4.      I have been tracking COVID-19 and the serious health and safety implications for NYSNA RNs since COVID-19 was first identified in China in December 2019.

5.      RNs have high risk, physically demanding jobs where they routinely confront workplace violence, are obligated to lift heavy patients, and commonly experience other physical stressors. Further, RNs often face occupational exposure to serious infectious diseases

1

such as tuberculosis and influenza.  Because of these difficult working conditions, even prior to the COVID-19 pandemic, nursing had one of the highest rates of occupational injury and illness of any profession.

6.     The methods by which the COVID-19 virus is transmitted and the troubling death rate of this virus has created significant and persistent danger to RNs.  COVID-19 is transmitted through three basic methods: (1) contact with a contaminated surface, (2) aerosolized droplets, which are secretions from coughing and sneezing, and (3) airborne particles.  Transmission of COVID-19 can occur from simply touching a contaminated surface at work, such as a computer at a nurses' station where reports are made, a bedrail or a patient's tray.  RNs caring for COVID-19 patients, many of whom have a persistent and aggressive cough, are regularly exposed to aerosolized droplets.  Further, during medical procedures such as intubations, when COVID-19 patients are put on a ventilator to assist in breathing, the number of aerosolized droplets and the risk to RNs significantly increases.  Airborne particles are smaller and drier, so they travel farther and stay in the air longer.  The risk from airborne particles is particularly acute for RNs because, without proper ventilation, the air itself in a COVID-19 hospital unit can become contaminated and deadly.

7.     NYSNA has compiled data tracking the horrendous toll the COVID-19 pandemic has taken on our RNs.  To date, at least six NYSNA RNs have died due to COVID-19 contracted at work, at least 84 NYSNA RNs have been hospitalized as a result of serious COVID-19 symptoms, and at least 954 NYSNA RNs have tested positive.  These numbers, which NYSNA has gathered independently of employer or government data using daily reports from NYSNA staff, almost certainly underreport the extent to which COVID-19 has infiltrated our membership.  Based on membership survey results reflecting that 11% of RNs have tested

positive for COVID-19 and New York State data showing that 22% of patients testing positive

have been hospitalized, we estimate that up to 1,000 NYSNA RNs could be hospitalized during

the course of the outbreak. Further, given the current New York state mortality rate of 5.4% for

COVID-19 positive patients, we estimate that up to 250 RNs could die. These estimates are

admittedly extrapolated from self-reported data, but is our best estimate of the likely impact of

the COVID-19 epidemic on our membership in light of the fluidity of the situation and the

absence of similar data from an official source.

       8.     Approximately 72% of NYSNA members responding to our survey have

been exposed to COVID-19 at work. As a result of this, even though testing has only

intermittently been made available to our members, based on a membership survey results,

approximately 11% of our membership or up to 4,620 members, could test positive during the

course of the outbreak. Finally, these statistics do not reflect the profound impact that COVID-

19 has had on RNs throughout New York State, as they do not include the thousands of

additional RNs working at non-NYSNA represented facilities.

       9.     Moreover, a recent CDC study dated April 14, 2020, available at

https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e6.htm?s_cid=mm6915e6_x, estimates that

health care personnel constitute 19% of all COVID-19 cases in the United States, with at least

9,200 infected healthcare workers in the United States.

       10.    Throughout this crisis, in an effort to protect themselves, their patients and

the public at large, NYSNA RNs have documented their extraordinarily dangerous working

conditions. NYSNA has created a COVID Protest of Assignment ("POA") form, which

documents, among other things, when RNs have inadequate Personal Protective Equipment

("PPE"), when certain PPE is not fit-tested, when they have been required to work outside their

competencies with COVID-19 patients without adequate training, and how many nurses, staff and visitors are exposed as a result of these unsafe conditions. RNs submit these POA forms to both management at their facilities and to NYSNA, thus creating a written record of the palpably unsafe conditions they are facing on a daily basis during this crisis. To date, NYSNA has received approximately 1,281 COVID POA forms from frontline RNs. Many of these POAs reflect RNs having no or completely inadequate PPE, and being assigned to critically ill patients, some on ventilators, for whom RNs do not have the necessary competencies or training.

11.     NYSNA also created COVID diary entry forms, which are web-based forms that NYSNA RNs may submit to document daily health and safety problems they encounter while working during the COVID-19 pandemic. To date, NYSNA has received approximately 7,453 COVID diary entries from approximately 4,128 frontline RNs. NYSNA staff reviews these diary entries to monitor the experiences of RNs, and compiles a report that documents the responses.

12.     Further, during the past few months, countless RNs have contacted me to discuss the very serious health and safety issues they have encountered during the COVID-19 pandemic, including the lack of PPE, the lack of adequate training, employers' refusals to test RNs, and the widespread practice of employers forcing RNs with COVID-19 symptoms to return to work when they are still sick. I also have heard regular reports from hundreds of RNs during daily virtual town hall and membership meetings, where RNs have consistently expressed their objective fears for their and their family's lives.

13.     I have also received numerous reports of facilities directing RNs who are COVID-19 positive to return to work before they have adequately recovered. Members of the general public are directed to self-quarantine for 14 days, and if their employer has 100 or more

4

employees, receive sick pay to recover during this period.  To the contrary, virtually all health

care facilities are directing health care workers to return to work after 7 days, when they still may

be quite symptomatic.  This premature return to work can have serious health and safety

consequences for sick RNs and the patients and coworkers who could be exposed.  For example,

RNs with respiratory symptoms, such as shortness of breath, may not be able to safely wear a

N95 respirator required to care for COVID-19 patients.

   14. Moreover, there is significant uncertainty in the public health community

as to how long COVID-19 is infectious.  Many RNs have expressed to me that they are terrified

that if forced to return to work prematurely, prior to recovering from COVID-19, they will infect

their co-workers and patients.  The 14-day standard for isolation after testing positive for

COVID-19 exists in order to safeguard the public and prevent the spread of the disease.  Sending

RNs back to work prior to 14 days, while they are potentially still infectious, is nothing less than

a gamble with the public's health.

   15. In order to safety care for COVID-19 patients, RNs must have respirators

that protect them from both aerosolized droplets and smaller airborne particles.  Surgical masks,

the only mouth and nose covering given many NYSNA RNs, are not respirators and are not

effective in protecting RNs from aerosolized droplets and airborne particles from COVID-19

patients.  While there are effective, reusable respirators such as powered air purifying respirators

("PAPRs") and elastomeric cartridge filter respirators, I am not aware of any health care

facilities with RNs represented by NYSNA that are regularly using these reusable respirators.

   16. The normal standard of care in the United States is that disposable N95

respirators must be discarded after each patient care session.  Despite this, many NYSNA

hospitals are directing the RNs to continue to use the same N95 respirator *for an entire week*,

during which time they are exposed to countless COVID-19 patients, and possibly exposing non-COVID-19 patients to the virus. The RNs are routinely directed to store their N95 in a paper bag for a week when they are not using it. The week-long storage and reuse of disposable N95 respirators, as well as the Governor's directive, has created a major infection control issue. Most major disposable N95 manufactures have not approved methods to decontaminate their respirators because it has yet to be adequately proven that disposable respirators can be effectively decontaminated in a way that maintains the fit and filtering integrity of the respirator and does not expose the wearer to additional hazards from cleaning chemical residue. This not only puts the health and life of RNs at risk, but also risks infecting other hospitalized patients who do not have COVID-19, the RNs' families and the community at large.

17.    OSHA directs that health care facilities first explore using reusable respirators, such as PAPRs and elastomeric cartridge filter respirators, prior to reusing disposable N95 respirators. However, I am not aware of any facility with NYSNA-represented RNs that has followed this direction.

18.    Rather, some employers are attempting to "disinfect" or "sanitize" disposable N95 respirators. There is no manufacturer that I am aware of that recommends health facilities attempt to clean or sanitize disposable N95 respirators, and OSHA requires health facilities to follow manufacturer guidelines. In order to safely disinfect a disposable N95 respirator, it is generally recognized by researchers and manufacturers that the following criteria must be met: (1) the disinfection process must be effective against the target organism, (2) the process must not cause damage to the respirator's filtration, (3) the process must not affect the respirator's fit, and (4) the process must be safe for the wearer (e.g., no off gassing of cleaning

chemicals). At this time no decontamination practice has been scientifically proven to meet all of these criteria.

19.     OSHA and PESH both require health care facilities to fit-test the model and size of the N95 respirators that they distribute to RNs. Fit-testing is a process where a technician measures whether there is a tight seal between the respirator and an RN's face. If there is no tight seal, contaminated air can seep in through the side of the respirator and endanger the RN. There are different models and sizes of N95 respirators and, if an RN fails a fit-test on one size or model, it is imperative, in order to protect the RN's health and life, that the employer continue fit-testing with different sizes and models until there is a proper fit.

20.     It is pervasive throughout health care facilities right now that employers are not fit-testing RNs on the N95 respirator models that they have provided during the COVID-19 crisis. Further, although many RNs have failed fit tests, their employers have refused to provide alternative models or sizes of N95 respirators. As a result, RNs are being needlessly exposed to COVID-19 through improperly fitting N95 respirators.

21.     Some RNs have also notified me that there is a lack of face shields available to protect their eyes and faces from COVID-19 infection, and that face shields that have been provided are not fitting properly and, in some instances, are slipping off. Further, certain cleaning methods used by health care facilities may negatively impact the face shield band, which can prevent a proper fit.

22.     To protect against COVID-19, it is essential that health care facilities provide RNs with fluid-resistant or impermeable gowns and/or body covering that is changed every time a RN treats an infectious patient. The vast majority of facilities are requiring RNs to use the same gown for multiple patients, even though some are COVID-19 positive and others

7

are not.  Additionally, most facilities are providing gowns that are neither fluid resistant nor
impermeable.  This is a serious infection control concern, which could result in new COVID-19
infections of patients, RNs, their families and their communities.

23.     RNs also report that some facilities are also not providing an adequate
designated changing area for donning and doffing PPE.  In order to safely remove PPE after use,
a space must be used (or created) that allows PPE to be doffed without contaminating "clean"
areas.  Negative pressure rooms often are designed with antechambers that accomplish this goal.
Space can also be created using prefabricated portable units or creating spatial divisions using
fire-rated plastic with zippers.  These are frequently set up in hospitals when construction work is
being conducted.  As a result of the lack of adequate donning and doffing space, there is a risk
that non-COVID areas can become contaminated, again needlessly putting RNs and non-
COVID-19 patients at risk.

24.     Finally, it is a long-standing practice in healthcare to use negative air
pressure rooms to care for infectious patients with airborne and droplet transmissible illnesses.
When done properly, this engineering control reduces the risk of a virus traveling into other areas
and, by rapidly exhausting and exchanging air in an area, it reduces airborne levels of COVID-
19, thus reducing the risk of staff exposure.  As per CDC recommendations, facilities can quickly
create additional negative air pressure, HEPA filtered areas for the care of COVID-19 patients.
Despite this clear CDC guidance, however, many facilities either have not done so, done so on
only a limited basis, or done so in ways that the rooms or areas did not function properly.  This is
yet another example of health care facilities blatantly disregarding the lives of RNs and patients.

25.     Because of the lack of adequate PPE and the hospitals' failure to adopt the
infection control measures outlined above, a huge number of our members have been exposed to

COVID-19. Many RNs have reported that they are experiencing symptoms consistent with COVID-19, such as fever, cough and shortness of breath. Yet, when these RNs have asked their own health care employer to have them tested for COVID-19, their requests have been routinely rejected. RNs have had to scramble to find testing on their own, often unsuccessfully, for a virus that they were exposed to and likely contracted at work. This is a major public health problem because RNs who do not know their COVID-19 status will inevitably unknowingly infect others. Indeed, an employer who does not know which employees are COVID-19 positive will not be able to conduct an adequate health and safety risk assessment for the rest of their staff and their patients.

26.     I have also received numerous reports of RNs being required to work with COVID-19 patients even though they have requested accommodations based on pregnancy, immunodeficiencies, or other pre-existing conditions, or leave under the Family Medical Leave Act ("FMLA"). To my knowledge, many legitimate requests for accommodation have been denied.

27.     Given the very serious risks outlined above that RNs are currently exposed to on a daily basis, it is imperative that the court intervene now to protect the health, safety and lives of NYSNA RNs, their patients, their families and their communities. If action is not taken now, we will see more nurses, patients and families get exposed to COVID-19 and, in many instances, die. There still is an opportunity to decrease the loss of human life and the spread of the virus. We are simply asking for measures that have been scientifically proven to help protect health care workers and their patients from COVID-19. Without this intervention, RNs, the patients they care for, and the general public will experience unnecessary suffering and death.

Sworn to before me this

_17_ day of _April_, 2020

_____

Lisa Baum

STATE OF NEW YORK

NOTARY SITUATED IN THE COUNTY OF QUEENS

    Pursuant to Governor Andrew Cuomo's Executive Order 202.7, I attest that on this 17 day of April 2020, appeared before me by Lisa Baum live audio-video technology, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to this instrument, affirmatively represented that she was physically situated in the County of [New York, NY, by her signature executed the same in her capacity, and sent a true electronic copy of the same signed, executed instrument to me in the County of Queens, NY.

Rory Barthel, Esq.

> **Notary Public State of New York**
> **Qualified in Queens County**
> **Notary Registration No. 02BA6193594**
> **Notary Commission Valid to 9/22/2020**

10