PROSKAUER ROSE LLP
Neil H. Abramson
Eleven Times Square
New York, NY  10036-8299
Telephone 212.969.3000
Fax 212.969.2900
nabramson@proskauer.com
*Attorneys for Montefiore Medical Center*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| THE NEW YORK STATE NURSES ASSOCIATION     : | |
|         : | |
| Plaintiff,     : | Case No.:  1:20-CV-03122 (JMF) |
|         : | |
| v.     : | **ECF Case** |
|         : | |
| MONTEFIORE MEDICAL CENTER,     : | |
|         : | |
| Defendant.     : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

 

**DEFENDANT MONTEFIORE MEDICAL CENTER'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF AND
<u>IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 4

I.     THE UNION'S REQUEST FOR AN INJUNCTION IS BARRED BY THE NORRIS-LAGUARDIA ACT ............................................................................... 4

      A.    The Anti-Injunction Provisions of the Norris-LaGuardia Act Are Not Satisfied Here ................................................................................................ 4

      B.    The Union Is Not Entitled To Injunctive Relief Because It Has Failed to Comply With Section 8 of the NLA ........................................................ 7

II.    THE UNION IS NOT ENTITLED TO A "REVERSE" *BOYS MARKETS* INJUNCTION ................................................................................................... 8

      A.    The Limited Exception To The Prohibition on Injunctions Under Norris-LaGuardia For "Reverse" *Boys Markets* Injunctions Is Not Applicable Here ................................................................................................. 8

      B.    Injunctive Relief Should Be Denied Because the Union Cannot Establish a Likelihood of Success on the Merits ...................................................... 15

      C.    The Balance of Equities and Public Interest Weighs Decidedly in Montefiore's Favor. .......................................................................... 22

II.    THE UNION'S COMPLAINT SHOULD BE DISMISSED. .......................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdul Wali v. Coughlin,*
  754 F.2d 1015 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Estate
  of Shabazz,* 482 U.S. 342 (1987)...........................................................16

*Am. Postal Workers Union v. United States Postal Serv.,*
  766 F.2d 715 (2d Cir.), *cert. denied,* 475 U.S. 1046 (1986)..................................15

*Bakery Drivers & Salesmen Local 194, IBT v. Harrison Baking Grp.,*
  869 F. Supp. 1168 (D.N.J. 1994) ...........................................................11, 12

*Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R.,*
  321 U.S. 50 (1944)...........................................................................7

*Boys Markets, Inc. v. Retail Clerks Union, Local 770,*
  398 U.S. 235 (1970)..................................................................... passim

*Buffalo Forge Co. v. United Steelworkers of Am.,*
  428 U.S. 397 (1976)........................................................................13

*Bunny Bread Co.,*
  74 Lab. Arb. Rep. (BNA) 55 (1980) (Yarowsky, Arb.)........................................21, 22

*Caribe Circuit Breaker Co.,*
  74K/09572, 63 Lab. Arb. Rep. (BNA) 261 (1974) (Pollock, Arb.).............................21

*Central Pa. Water Supply Co.,*
  101 Lab. Arb. Rep. (BNA) 873 (1993) (Talarico, Arb.)......................................21

*Corning Inc. v. PicVue Elecs., Ltd.,*
  365 F.3d 156 (2d Cir. 2004)...............................................................14

*Emery Air Freight Corp. v. Int'l Bhd. of Teamsters, Local 295,*
  185 F.3d 85 (2d Cir. 1999)................................................................6

*Emery Air Freight Corp. v. Local Union 295,*
  449 F.2d 586 (2d Cir. 1971), *amended* (2d Cir. Dec. 2, 1971)..............................5

*Hoh v. Pepsico,*
  491 F.2d 556 (2d Cir. 1974)...............................................................9, 17

*In re Arbitration Between Local 227, United Food,*
  94-23589, 1995 Lab. Arb. Rep. (BNA) Supp. 114061 (1995) (Ferree, Arb.) ...................21

ii

*In re Dist. No. 1-Pacific Coast Dist., Marine Engineers' Beneficial Ass'n*,
  723 F.2d 70 (D.C. Cir. 1983) ................................................................................5

*Jackson Dairy, Inc. v. H.P. Hood & Sons*,
  596 F.2d 70 (2d Cir. 1979) ....................................................................................9

*Jordan v. Pierre*,
  No. 18-CV-8528 (JGK), 2018 WL 5447542 (S.D.N.Y. Oct. 27, 2018) ...................6

*Local 217 Hotel & Rest. Emps. Union v. MHM, Inc.*,
  805 F. Supp. 93 (D. Conn. 1991), *aff'd*, 976 F.2d 805 (2d Cir. 1992) .................11, 12, 15, 16

*Local 88502 of Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*
  *AFL-CIO-CWA v. Morgan Advanced Materials & Tech., Inc.*,
  No. CV 19-215, 2019 WL 3769201 (W.D. Pa. Aug. 9, 2019) ...............................11

*Microtech Contr. Corp. v. Mason Tenders Dist. Council of Greater N.Y.*
  55 F. Supp. 3d 381 (E.D.N.Y. 2014) ...................................................................16

*New York v. Hotel, Nursing Home & Allied Health Servs. Union*,
  410 F. Supp. 225 (S.D.N.Y. 1976) ......................................................................24

*Niagara Hooker Emps. Union v. Occidental Chem. Corp.*,
  935 F.2d 1370 (2d Cir. 1991) ...................................................................... passim

*Smith v. Potter*,
  187 F. Supp. 2d 93 (S.D.N.Y. 2001), *aff'd*, 343 F.3d 619 (2d. Cir. 2003) ............18

*Truck Drivers Local Union No. 807, Int'l Bhd. of Teamsters v. Bohack Corp.*,
  541 F.2d 312 (2d Cir. 1976) ..................................................................................6

*United Parcel Serv. v. Local 80, Int'l Bhd. of Teamsters*,
  698 F.2d 100 (2d Cir. 1983) ..............................................................................5, 14

*United States v. Thorn*,
  317 F.3d 107 (2d Cir. 2003) ................................................................................16

*United Steelworkers of Am. v. Am. Mfg. Co.*,
  363 U.S. 564 (1960) ............................................................................................16

*United Tel. Workers v. W. Union Corp.*
  771 F.2d 699 (3d Cir. 1985) ..................................................................................5

*Virginia-Carolina Chem. Co.*
  42 Lab. Arb. Rep. (BNA) 237 (1964) (Kesselman, Arb.) .....................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ..................................................................................................9

**STATUTES**

29 U.S.C. § 101 .............................................................................................................5

29 U.S.C. § 107 ...........................................................................................................5, 6

29 U.S.C. §  108 .............................................................................................................7

29 U.S.C. § 109 ..................................................................................................6, 11, 14

Emergency Disaster Treatment Protection Act ...........................................................23

N.Y. Pub. Health Law § 3080 .....................................................................................23

Norris-LaGuardia Act ........................................................................................ passim

**OTHER AUTHORITIES**

*Elkouri & Elkouri: How Arbitration Works*, Chapter 13.13.E .....................................21

Fed. R. Civ. P. 43(a) ......................................................................................................6

Fed. R. Civ. P. 65(d)(1) ................................................................................................14

## PRELIMINARY STATEMENT

Defendant Montefiore Medical Center ("Montefiore") submits this consolidated memorandum of law and accompanying affidavits in opposition to the New York State Nurses Association's ("NYSNA" or the "Union") request for injunctive relief and in support of Montefiore's motion to dismiss the Complaint.

In the middle of the worst pandemic in a lifetime, where life and death decisions are being made by the minute, the Union wants to employ this Court as a micro-manager of standards of patient care in one of New York's front-line medical centers.  The requested relief would, if granted, cause massive disruption to an already overburdened and strained healthcare facility.  The consequences would be nothing short of catastrophic for patients, health care providers, the City that Montefiore serves, and hospitals across the nation struggling under the weight of these exact same conditions who will be forced to conclude that compliance with controlling governmental guidance will put them at risk of legal sanction.

There is no factual or legal basis for the extraordinary injunctive relief that the Union seeks.[1]  As a matter of undisputed fact, Montefiore has complied in full measure with every regulation and recommendation promulgated by federal, state and local agencies charged with protecting public health together with the safety of health care providers during the unprecedented national health emergency posed by the COVID-19 pandemic.  These agencies were acutely aware of the delicate balance associated with the need to protect health care providers, such as NYSNA members, while those health care providers are treating patients. Despite the absence of any allegation in the Union's moving papers that Montefiore failed to

---

[1] The relevant facts are set forth in full in the accompanying affidavits of David Brodsky, Vice President of Employee and Labor Relations, Maureen Scanlan, Vice President of Nursing and Patient Care Services, Dr. Andrew Racine, System Senior Vice President and Chief Medical Officer, Dr. Theresa Madaline, Healthcare Epidemiologist and J. Peter Savini, Vice President of Business Process Transformation.

adhere to any of those recommendations or a specific provision in the parties' collective bargaining agreement ("CBA") requiring deviation from those recommendations, the Union nevertheless requests affirmative equitable relief – first from this Court and then that same relief from an arbitrator – that Montefiore be ordered to "do more" than the expert public health agencies require.  While the Union's request for additional protections during this pandemic certainly is understandable, its belief that Montefiore should be taking even greater precautions cannot be the predicate for the extraordinary injunctive relief that the Union seeks, particularly because the CBA provision on which the Union relies requires Montefiore to "observe all applicable health and safety laws."

And it is undisputed that, through its Herculean efforts to manage through national supply shortages of personal protective equipment ("PPE") and COVID-19 testing, as well as unprecedented conditions caused by the pandemic, full compliance with all applicable laws and regulations is precisely what Montefiore has achieved.  In short, Montefiore has managed to protect its staff to the fullest extent possible while at the same time fulfilling its mission to care for patients at the epicenter of this pandemic.

Thus, it is clear from the face of the Union's papers that it does not seek to *preserve* the status quo in aid of arbitration, but rather to impose new and additional obligations on Montefiore that would profoundly *alter* the status quo and grant the Union the ultimate relief it requests in the grievance.  Indeed, in the Union's voluminous moving papers, there is not a single term and condition of employment that it seeks to preserve in advance of arbitration, only a "wish list" of additional steps it believes Montefiore should be taking during this pandemic.

As demonstrated below, based on the well-settled case law in this Circuit, the Court does not have jurisdiction to grant the sweeping injunction the Union seeks because the Norris-

LaGuardia Act (the "NLA") bars the injunctive relief requested here.  While courts have recognized a very narrow exception to the NLA's prohibition on injunctions in labor disputes, known as a "reverse" *Boys Markets* injunction, the Union does not remotely satisfy the purposefully exacting requirements to obtain this extraordinary relief.  In addition to establishing the traditional equitable requirements for injunctive relief – namely, likelihood of success on the merits, irreparable harm, and balancing of the hardships in favor of the moving party – to obtain an injunction in aid of arbitration in a labor dispute, the moving party must also establish that court intervention is needed to preserve the status quo and that the arbitration would be rendered a "hollow formality" in the absence of such relief.   The Union cannot possibly meet that purposefully high standard here because, as noted above, the Union does not seek to preserve the status quo in aid of arbitration.  To the contrary, granting the injunction would have the exact opposite effect – it would strip the arbitrator of any authority because the Union will have obtained its requested remedy from this Court; the injunction would render the arbitration meaningless rather than preserve it.

In any event, the Union cannot establish that it is likely to succeed on the merits of its grievance under the heightened standard applicable to mandatory injunctions.  Montefiore has complied with all of its contractual obligations, even during these exigent circumstances.  No rational arbitrator could interpret a contractual requirement to comply with "applicable health and safety laws" as requiring Montefiore to adhere to more rigorous requirements than what the federal, state, and local health agencies charged with managing all of the elements of this pandemic have recommended. To the contrary, it is well-established that the recommendations Montefiore has followed are entitled to extreme deference during this health emergency.

3

In addition, the balance of equities weighs decidedly in Montefiore's favor. Requiring Montefiore to comply with new broad and wholly undefined standards such as "as needed," "adequate," "on demand," and "improved" upon the risk of civil contempt would paralyze Montefiore's ability to provide critical care to COVID-19 patients because split-second decisions on critical patient care issues would be subject to potential civil contempt. Allowing someone other than the governmental public health experts to determine what is, for example, "adequate" PPE will result in rapid exhaustion of those limited supplies, rendering Montefiore unable to treat these very sick patients at all. Likewise, restricting how the hospital can best deploy its valuable nursing resources during this emergency on pain of contempt will leave patients without bedside care. The Court can go through each and every vague element of relief the Union seeks here and the result is the same – if granted, the delicate balance between protecting staff and patient care that currently exists will be damaged and patients will lose. The public's interest in managing this health emergency – as expressed through compliance with governmental recommendations – will be grievously harmed.

Accordingly, the Union's request for injunctive relief should be denied. Because the request for injunctive relief is the lone claim asserted in the Complaint, the Complaint should be dismissed with prejudice.

## ARGUMENT

### I.    THE UNION'S REQUEST FOR AN INJUNCTION IS BARRED BY THE NORRIS-LAGUARDIA ACT.

#### A.    The Anti-Injunction Provisions Of The Norris-LaGuardia Act Are Not Satisfied Here.

The Norris-LaGuardia Act, 29 U.S.C. §§ 101-15, restricts the jurisdiction of federal courts to issue "any restraining order or temporary or permanent injunction in a case involving or

growing out of a labor dispute."   The Union concedes that this is a labor dispute and therefore the NLA and its jurisdictional prohibition on injunctions applies.  (Dkt. 6 at 18.)

The NLA has been construed to permit only very narrow exceptions to its prohibition against injunctions in labor disputes.  Even in those exceptional cases, injunctive relief may be issued only if certain exacting requirements are met.  Strict adherence to those requirements is not merely a matter of form.  Unless the explicit terms of the NLA are strictly adhered to, a federal district court does not have jurisdiction under the NLA to issue injunctive relief.  29 U.S.C. § 101.  *See United Tel. Workers v. W. Union Corp.* 771 F.2d 699, 704 (3d Cir. 1985); *In re Dist. No. 1-Pacific Coast Dist., Marine Engineers' Beneficial Ass'n*, 723 F.2d 70, 76-77 (D.C. Cir. 1983); *United Parcel Serv. v. Local 80, Int'l Bhd. of Teamsters*, 698 F.2d 100 (2d Cir. 1983).

First, pursuant to Section 107 of the NLA, injunctive relief cannot be granted on the basis of affidavits alone.  The Court specifically requested briefing regarding whether Section 107 prohibits entry of an injunction without a hearing in open court, with opportunity for cross-examination.  Section 107 is clear that the NLA prohibits injunctive relief unless there is sworn testimony, both in support of and in opposition to the application for injunctive relief, in open court, that is subject to cross-examination.  Courts in this Circuit strictly apply the requirements of Section 107 to *Boys Markets* injunctions.  *See Emery Air Freight Corp. v. Local Union 295*, 449 F.2d 586, 588 (2d Cir. 1971), *amended*, (2d Cir. Dec. 2, 1971) ("before an employer in a dispute with a union can obtain an injunction, there are a number of conditions to be satisfied. Section 7 of the Act, 29 U.S.C. § 107, lists a good many of them").[2]

---

[2]  Section 107 also requires that before temporary injunctive relief is granted, the complainant shall first file an undertaking with adequate security in an amount to recompense those enjoined for any loss, expense or damages caused by the improper issuance of an injunction, including all reasonable costs (including reasonable attorney's fees) and the expense of defending against the granting of injunctive relief.  29 U.S.C. § 107.  The Union has not done that here.

In light of the current public health crisis, we believe the parties do not need to be physically present in the courtroom to satisfy NLA's requirement that there be a hearing in open court before an injunction may be granted.  *See* Fed. R. Civ. P. 43(a) ("Open Court. … For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."); *Jordan v. Pierre*, No. 18-CV-8528 (JGK), 2018 WL 5447542, at *1 (S.D.N.Y. Oct. 27, 2018) ("The plaintiff complains that the argument was by telephone rather than in open court, but the plaintiff appeared by phone only because he could not come to the Courtroom. The hearing was held in open court with a court reporter, and a transcript was made. There is no merit to the plaintiff's objections.").  However, we have found no case law abrogating the parties' right to engage in cross-examination.  We note, moreover, that a hearing is *not* required under the NLA before injunctive relief may be *denied*.

Also pursuant to Section 107, an injunction may not be issued without a finding by the court that, *inter alia,* (a) there will be substantial and irreparable injury to the complainant's property; (b) greater injury will be inflicted upon the complainant by the denial of the relief than will be inflicted upon the opposing party by the granting of relief; and (c) the complainant has no adequate remedy at law.  29 U.S.C. § 107; *Emery Air Freight Corp. v. Int'l Bhd. of Teamsters, Local 295*, 185 F.3d 85, 89 (2d Cir. 1999); *Truck Drivers Local Union No. 807, Int'l Bhd. of Teamsters v. Bohack Corp.*, 541 F.2d 312, 317 n.8 (2d Cir. 1976).

In addition, Section 109 requires that an injunction can be issued in a case involving or growing out of a labor dispute only "on the basis of findings of fact made and filed by the court." 29 U.S.C. § 109.  Importantly, Section 109 has a specificity requirement, requiring that any injunction "shall include only a ***prohibition of such specific act or acts*** as may be expressly

6

complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter." (emphasis added).

    **B.**    **The Union Is Not Entitled To Injunctive Relief Because It Has Failed To Comply With Section 8 of the NLA.**

Section 108 of the NLA, otherwise known as the "clean hands" provision, provides that "[n]o restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make ***every reasonable effort*** to settle such dispute either by negotiation or with the aid of . . . mediation or voluntary arbitration." 29 U.S.C. § 108 (emphasis added). The purpose of this section is to limit preliminary injunctive relief to a "last line of defense," available only after alternative dispute resolution methods have been exhausted. *Bhd. of R.R. Trainmen, Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R.,* 321 U.S. 50, 58-59 (1944).

Under the Parties' agreement, in the event of a dispute regarding staffing, the Union is required to bring the matter to the attention of the Allocation Committee. (Brodsky Aff., Ex. B at ¶¶ 6(6), 6(12).) The Allocation Committee is charged with resolving the underlying dispute in less than 72 hours, which, if unsuccessful is followed by a maximum of three days of mediation. If the mediation is not successful, the dispute is submitted to a tripartite panel to render a final decision within five business days. This process requires a maximum of eleven days to bring staffing ratio disputes to a final and binding outcome.

As stated in Montefiore's April 21, 2020 letter (Dkt. 15), the Union has not even attempted to avail itself of this contractually-required dispute resolution procedure with regard to staffing disputes. With respect to the non-staffing aspects of the grievance, the Union waited weeks to file its grievance despite the purported existence of the alleged violative conditions

from the start of the COVID-19 pandemic in March.  Moreover, the Union's request for an injunction seeking additional space for donning and doffing has not been the subject of *any* grievance.  The Union waited until April 14 to first file a grievance.  They announced to the media that they would file this action the very next day. The injunction they claim to need is not required as a result of delays in the dispute resolution process, but rather based solely on when they chose to file their grievance. That is entirely inconsistent with the purpose of Section 108. This Court should not be used as a substitute for the timely use of the parties' contractual dispute resolution mechanisms.

II.     **THE UNION IS NOT ENTITLED TO A "REVERSE" *BOYS MARKETS* INJUNCTION.**

A.     **The Limited Exception To The Prohibition on Injunctions Under Norris-LaGuardia For "Reverse" *Boys Markets* Injunctions Is Not Applicable Here.**

In *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 252-53 (1970), the Supreme Court carved out a limited exception to the NLA's prohibition against injunctions in labor disputes.  Under *Boys Markets*, a court has jurisdiction to enjoin a strike in violation of a contractual no-strike clause when the strike concerns a dispute that is arbitrable under the parties' collective bargaining agreement.

The Second Circuit has made clear that the limited exception recognized in *Boys Markets* is even more limited when a union seeks a "reverse" *Boys Markets* injunction, *i.e.*, an injunction against an employer to maintain the status quo in aid of arbitration by prohibiting the employer from acting during the pendency of an arbitration. *Niagara Hooker Emps. Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1377 (2d Cir. 1991). The court in *Niagara Hooker* recognized that the *Boys Markets* exception to Norris-LaGuardia "cannot simply be imported wholesale when a union seeks to enjoin an employer action pending arbitration."   Rather, it is only in the most extreme cases – where the employer's action "has the effect of frustrating the arbitral process or

8

rendering it a 'hollow formality'" – that a union may obtain a *status quo* injunction in order to avoid rendering the arbitration process "meaningless." *Id.* (citation omitted). Thus, the Court held:

> The arbitration process is rendered meaningless only if an arbitral award in favor of the union would substantially fail to undo the harm occasioned by the lack of a status quo injunction . . . The arbitral process is not rendered 'meaningless,' however, by the inability of an arbitrator to completely restore the status quo ante or by the existence of some interim damage that is irremediable . . . .  Rather, for an injunction to issue at the Union's behest, the ***irremediable injury in question must be such as to threaten the integrity of the arbitration process itself***.

*Id*. at 1378 (emphasis added).

The law in this Circuit is clear:  A reverse *Boys Markets* injunction is appropriate only in the extremely limited circumstance where it serves to *maintain the status quo* to "preserve the arbitral process." *Niagara Hooker*, 935 F.2d at 1376 -77.

Moreover, even if the Union can demonstrate irreparable harm to the arbitration process within the meaning of *Niagara Hooker*, it still has the burden to demonstrate that the traditional equitable requirements of injunctive relief have been satisfied, *i.e.*, there is a likelihood of success on the merits, irreparable harm, a balancing of hardships that favors issuance of injunctive relief, and consideration of the public interest.  *Id*. at 1377-78; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979); *Hoh v. Pepsico*, 491 F.2d 556, 561 (2d Cir. 1974) (likelihood of success on the merits "must mean not simply some likelihood of success in compelling arbitration but in obtaining the award in aid of which the injunction is sought").

As explained below, the Union has not met any of these purposefully high burdens.

1. _The Union's Requested Injunction Fails Because It Does Not Seek to Preserve the "Status Quo" But Rather Seeks to Change It._

The Union's request for injunctive relief cannot be considered in a vacuum.  The so-called request to preserve the "status quo" was brought at the apex of an unprecedented health crisis.  The myriad health issues associated with the pandemic – e.g., the availability of PPE, COVID-19 testing, personnel issues – are far from static.  Conditions on the ground change, on a daily, if not hourly basis due to the rapidly evolving nature of this pandemic.  Accordingly, there is no defined "status quo" to preserve in aid of arbitration, much less a status quo that can be defined with the precision required by the NLA.  To the extent a status quo here exists at all, it can be only Montefiore's continued adherence to the ever-evolving guidelines set by the Center for Disease Control ("CDC") and the New York State Department of Health ("NYSDOH"), and New York City Department of Health and Mental Hygiene ("NYCDOH") – rules and recommendations that are designed to protect both patients and healthcare workers.

Conspicuously absent from the Union's papers is the hint of an allegation that Montefiore has not complied with the recommendations from those expert agencies.  Rather, the Union contends that those agencies' recommendations are not sufficient, and asks that this Court overrule those recommendations in the midst of a pandemic and order Montefiore to make even greater strides above and beyond what the public health experts have determined is appropriate during this healthcare crisis.

What the Union seeks in this proceeding is a quintessential alteration of the "status quo." For example, while Montefiore has provided nurses _all_ equipment recommended by government agencies, the Union asks for much more, namely that the Court to order Montefiore "_to provide_" certain levels of PPE.  In addition, in recognition of the scarcity of testing, the CDC recommends that symptomatic nurses be prioritized for diagnostic testing, which is precisely what Montefiore

has done (in fact, Montefiore has now extended testing to a broader group of associates).  The Union, however, asks the Court to require Montefiore "*to provide*" coronavirus testing of its members "*on demand*, including antibody testing" that has yet to be validated.  (Dkt. 5)  Montefiore also has provided associates with designated donning and doffing areas that have satisfied applicable health and safety requirements for years.  The Union now says that those areas are not sufficient and asks the Court to order Montefiore "to provide" locations for donning and doffing beyond what it already provides.  (Dkt. 5.)

The Union does not seek to "prohibit" Montefiore from taking any specific act, but rather seeks to *compel* them to take *un*specific acts (*see also infra* at II.A.3).  This is not a status quo injunction, but a status quo creation.

These kinds of changes to the status quo simply are incompatible with Section 109 of the NLA, which limits the Court's jurisdiction to issue an injunction only to specific acts of "prohibition."  Consistent with Section 109's limitation to acts of "prohibition," courts construing the limited reverse *Boys Markets* exception to the NLA consistently have foreclosed the very type of mandatory injunction that the Union seeks here.  *See Local 217 Hotel & Rest. Emps. Union v. MHM, Inc.*, 805 F. Supp. 93, 109 (D. Conn. 1991) (denying reverse *Boys Markets* injunction where the Union "does not merely ask the court to extend [the employer's] 'holding pattern' but to recreate one"), *aff'd*, 976 F.2d 805 (2d Cir. 1992); *Local 88502 of Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers AFL-CIO-CWA v. Morgan Advanced Materials & Tech., Inc.*, No. CV 19-215, 2019 WL 3769201, at *4 (W.D. Pa. Aug. 9, 2019) (refusing to issue injunction where "the Union here is not merely seeking to maintain the status quo, but is seeking to restore the conditions that existed prior to the company's implementation of its Outsourcing Proposal."); *Bakery Drivers & Salesmen Local 194, IBT v.*

*Harrison Baking Grp.*, 869 F. Supp. 1168, 1179 (D.N.J. 1994) ("the requested relief in the instant case seeks to change the status quo by rescinding previous sales and transfers of routes prior to arbitration. Such preliminary relief is not appropriate, nor is it necessary to preserve the arbitral process").

    2.  <u>The Union's Injunction Would Provide The Ultimate Relief And Therefore Impermissibly Usurp the Role of the Arbitrator</u>.

      The Union's proposed injunction is inappropriate for the additional reason that it seeks the ultimate relief requested in the grievance and would usurp the arbitrator's jurisdiction to interpret the contract.  In its grievance, the Union asks Montefiore to take immediate action regarding a number of health and safety issues that overlap with its requested injunction. *Compare* Brodsky Aff. Ex. B *with* Dkt. 5.  For example, the Union's requested remedy in the grievance asks for an order that Montefiore provide nurses with new PPE for each patient; the injunction asks the Court to order Montefiore to provide nurses with "sufficient" PPE "as needed."  In addition, the Union's grievance and injunction both demand that Montefiore provide nurses with "adequate" and "on demand" diagnostic and anti-body testing.  Similarly, the Union's grievance and the injunction both demand that Montefiore accommodate nurses, and provide nurses with paid COVID-19-related leave.

      The so-called injunctive relief is not provisional in any respect, and is contrary to the express purpose underlying the reverse *Boys Markets* doctrine as expressed in *Niagara Hooker* because "the relief requested . . . would not be in 'aid' of the arbitration, but essentially would be in lieu of it."  *MHM, Inc.*, 805 F. Supp. at 109.  This is made most clear by the fact that if the Union were to lose the arbitration after obtaining the requested injunction, Montefiore would then need to revert back to the manner in which it had been addressing this emergency before judicial intervention.  This is not an anticipated sale of a business held in place awaiting an

arbitrator's judgement allowing it to proceed; this is a request for a judicial command that Montefiore take affirmative steps in the anticipation than an arbitrator would agree. The Union's requested injunction thus turns the entire purpose of the reverse *Boys Markets* injunction exception to the NLA on its head. *See Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 410-12 (1976). *See also Niagara Hooker*, 935 F.2d at 1377 (cautioning against issuance of a *Boys Markets* injunction when it would "usurp[] the function of the arbitrator").

Indeed, because the requested injunction is at least coextensive with the remedy requested in the grievance – in fact, the requested injunction seeks additional relief that is not even included as part of the grievance – granting injunctive relief here would have the effect of the Court substituting its judgment for that of the grievance arbitrator, who has exclusive responsibility for interpreting the CBA.  Divesting the arbitrator of this responsibility is the exact opposite of an injunction "in aid of arbitration" contemplated by *Niagara Hooker*.

    *3.  The Union's Injunction Fails Because the Relief Requested Is Not Specific and Is Hopelessly Vague.*

The Union's request for injunctive relief fails for an equally fundamental reason:  the relief requested is not specific and is hopelessly vague.  For example, the Union asks Montefiore to provide PPE "in sufficient number so that they can be changed when needed" but that vague and subjective standard does not define what the Union or a factfinder would deem "sufficient" or when the Union believes PPE "needs" to be changed.   In addition, the Union asks for a "secure" or "proper" space for donning and doffing, but it is unclear what the Union or a factfinder would consider "secure" or "proper."   The Union also requests "adequate" training but does not define what would be "adequate."

This type of imprecise mandatory injunction is inconsistent with the plain text of NLA, which requires the Union to identify "specific acts" of "prohibition" such that the Court can

13

"make specific findings of fact." 29 U.S.C. § 109.   The Court cannot possibly make the requisite specific findings of fact when neither the Complaint nor the request for relief sets forth specifically what Montefiore should be required to do.[3]  *See United Parcel Serv., Inc. v. Local 804, Int'l Bhd. of Teamsters.*, 698 F.2d 100, 105 (2d Cir. 1983) ("we held that the specificity requirements in § 9 of the Act which circumscribe the scope of labor injunctions were consonant with *Boys Markets*").

The lack of specificity in the requested injunction dooms the Union's request for equitable relief.  Courts routinely have declined to issue injunctions when the requested relief is as undefined as it is here.  *See* Fed. R. Civ. P. 65(d)(1) (order granting injunction must "state its terms specifically"); *Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) (vacation injunction where it was "not possible 'to ascertain from the four corners of the order precisely what acts are forbidden.'") (citation omitted).  The Union's request here is equally defective.

 4. *The Union Cannot Demonstrate That Arbitration Would Be A Hollow Formality Absent An Injunction.*

The Union brushes aside *Niagara Hooker's* exacting requirement that it demonstrate that the arbitration will be a "hollow formality" in the absence of an injunction, devoting a mere six lines in its moving brief to this critical showing without citing a single case. (Dkt. 6 at 18-19). That the subject of the Union's dispute concerns the health and safety of its members does not salvage its request for an injunction.  *Niagara Hooker* was clear:  even "interim damage that is irremediable" is not grounds for injunctive relief in a labor dispute.  935 F.2d at 1377.  The injury must be to the *arbitration process itself*, and there has been no such showing here.

---

[3]  As noted above, the requested injunction seeks to impose affirmative obligations on Montefiore, not to "prohibit" it from taking action as Section 109 of the NLA requires.

14

With respect to staffing and other claims related to compensation and leave, these disputes fail the "hollow formality" test for the additional reason that they easily would be remediable through the arbitration process. Indeed, courts have held that more significant employment actions, such as discharge, cannot be used to justify a *status quo* injunction under *Niagara Hooker* or even to demonstrate traditional "irreparable harm" to the arbitration process itself. *See Niagara Hooker*, 935 F.2d at 1379 (holding that an injunction was not authorized under *Boys Markets* because the arbitrator "may order reinstatement and back pay for an employee who is discharged or disciplined as a result of a false positive test result," and therefore would not render the arbitral process a "hollow formality"); *see also Am. Postal Workers Union v. United States Postal Serv.*, 766 F.2d 715, 723 (2d Cir. 1985), *cert. denied*, 475 U.S. 1046 (1986) (arbitral process not frustrated where employee is wrongfully discharged because employment loss is only temporary, if union wins at arbitration, employee can be restored to former status).

Finally, the Union raises a brand new dispute regarding donning and doffing space that was not even included as part of its grievance. This dispute clearly cannot form the basis for an injunction in aid of arbitration under the NLA because the Union has not initiated the arbitration process.

**B.**     **Injunctive Relief Should Be Denied Because the Union Cannot Establish a Likelihood of Success on the Merits.**

Even if the Union could somehow demonstrate that it seeks to preserve the status quo in aid of arbitration and that, in the absence of an injunction, the arbitration would be rendered a "hollow formality" within the meaning of *Niagara Hooker*, which it cannot, it fails to satisfy the other requirements for injunctive relief. Where, as here, a party seeks mandatory (as opposed to provisional) relief, courts are clear that "[a] 'greater showing is required of the moving party.'"

15

*MHM, Inc.*, 805 F. Supp. at 105 (citation omitted).   Because the Union is asking the Court to order Montefiore to implement *affirmative* changes to staffing and PPE protocols that have been in place throughout the pandemic, it is a request for a mandatory injunction and the Union therefore must make a "clear showing that [it] is entitled to the relief requested."   *Id.* at 105 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)).  *See also United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003) (citing *Abdul Wali* for holding that "parties seeking a preliminary injunction that would grant the movant substantially all the relief he ultimately seeks and not merely maintain the status quo 'must show a substantial likelihood of success on the merits, i.e., that their cause is considerably more likely to succeed than fail'").   The Union cannot establish a likelihood of success on the merits of its grievance, much less make a "clear" showing that it is entitled to the relief in order to obtain the mandatory injunction it requests here.

In a tacit admission that the Union cannot meet this standard, it suggests that an injunction can issue here so long as the grievance "is not futile."  (Dkt. 6 at 21.)  The cases the Union cites for that proposition are inapposite, as they are all out of Circuit, including cases discussing the presumption of arbitrability applying that standard.  *See* Dkt. 6 at 22 (citing *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564 (1960) for the proposition that courts should not delve into the merits of a grievance when resolving the issue of arbitrability).  Given the exacting standards for a reverse *Boys Markets* injunction that apply in *this* Circuit, however, courts do not simply stop their analysis if the arbitration would not be futile but assess the likelihood of success on the merits consistent with *Niagara Hooker.  See, e.g., Microtech Contr. Corp. v. Mason Tenders Dist. Council of Greater N.Y.*, 55 F. Supp. 3d 381 (E.D.N.Y. 2014) (noting that although requested injunction was barred by the NLA because the dispute was not

arbitrable, the plaintiff would have been unsuccessful regardless because it had not established a likelihood of success on the merits); *see also Hoh*, 491 F.2d at 561.

The Union alleges that Montefiore violated Section 11.3 of the CBA, which provides, in relevant part, that "[t]he Employer will observe all applicable health and safety laws and regulations and will take steps necessary to assure employee health and safety."  (CBA, Section 11.3).  Other than the bald claim that Montefiore violated Section 11.3, the Union has not pointed to a single applicable law, regulation, or contractual provision with which Montefiore allegedly failed to comply.

1. *Montefiore Provides Nurses with PPE Consistent with Recommendations from Governmental Public Health and Safety Agencies.*

The Union cannot under any circumstances demonstrate any likelihood that it will prevail because it is undisputed that Montefiore has complied with guidance from the CDC, NYSDOH, and other government orders and directives throughout the pandemic.   Montefiore has provided each nurse with the PPE recommended by the foregoing public health agencies and has otherwise followed their recommendations as well as those of the Occupational Health and Safety Administration ("OSHA") with respect to health and safety issues at its facilities. (Madaline Aff. ¶ 9.)  For example,

- Every front-facing nurse receives an N95 mask at the beginning of every shift.[4] Montefiore has made these masks available without interruption. (Madaline Aff. ¶ 11.)

- Montefiore follows guidance from OSHA on how to fit-test a mask during the current pandemic. (Madaline Aff. ¶ 13.)

---

[4] Indeed, Montefiore follows the precise policy of distribution of N95 masks that NYSNA has lauded as appropriate in another context.  NYSNA has now sued the NYSDOH to require it to enforce that very same rule it challenges here.  *See* NY Sup. Ct. Index No. 153033/2020.

- Montefiore follows CDC guidance about how to use and reuse N95 masks in light of the national shortage (one per shift unless soiled or damaged). (Madaline Aff. ¶¶ 15-18.)

- Montefiore makes available without interruption face shields, isolation gowns, gloves, and disinfectant in accordance with CDC guidelines. (Madaline Aff. ¶¶ 11, 19-22, 22-34.)

- Montefiore provides negative pressure rooms for procedures that could result in aerosolization of COVID-19.  When those rooms are not available, portable HEPA filters are used, which is all consistent with the highest protocols of care. (Madaline Aff. ¶¶ 41-45.)

- Montefiore restricted visitor access on March 18, 2020 in accordance with New York State guidelines.  (Madaline Aff. ¶¶ 35-37.)

- Montefiore cancelled all elective procedures on March 19, 2020. (Madaline Aff. ¶ 46.)

There is not even a suggestion that an arbitrator would overrule a hospital's management decision in the midst of a pandemic to follow the recommendations of the CDC (or any other governmental health and safety agency).  To the contrary, it is well-recognized that "[t]he CDC is the federal agency responsible for protecting the public health of the country by providing leadership and direction in the prevention and control of diseases." *Smith v. Potter*, 187 F. Supp. 2d 93, 97 (S.D.N.Y. 2001), *aff'd*, 343 F.3d 619 (2d. Cir. 2003) (citation omitted).  Notably, in *Smith*, the court denied a preliminary injunction seeking to shut down and decontaminate a facility where anthrax spores had been found precisely because the employer implemented the CDC's recommended actions.  *Id*.

2. *Montefiore Has Made Extraordinary Efforts to Provide Testing to All Associates.*

With respect to testing, throughout this pandemic, there has been a shortage of diagnostic testing to determine whether someone is infected with COVID-19.  As a result, Montefiore prioritized symptomatic staff in accordance with CDC guidelines. (Racine Aff. ¶¶ 18-19.) Indeed, just three days ago Governor Cuomo cautioned that testing shortages will persist if the

18

federal government does not intervene and assist the State in testing.  (Racine Aff. ¶ 22.)

Montefiore now makes testing available to both symptomatic and asymptomatic staff.  (Racine

Aff. ¶ 21.)   Antibody testing had not existed until recently and therefore had not been provided

to staff. To date, no antibody test has been validated.  In fact, Montefiore invested substantial

time and resources in developing its own anti-body test, which it will now be offering to staff.

(Racine Aff. ¶ 23.)

   3.  *Montefiore's Staffing and Deployment of Nurses Fully Comports with the CBA.*

   Leaving aside the Union's failure to adhere to the dispute resolution procedures

applicable to staffing disputes, the grievance ignores that there is an express provision of the

CBA that specifically affords Montefiore flexibility in staffing.  Section 3.07 of the CBA

provides as follows:

> Recognizing the importance of adequate staffing for the provision of quality patient care, the Employer and the Association recognize that there should be an appropriate number of staff on each unit. Staffing levels shall be based, in part, on an assessment of the patients on the unit, the unit's average daily census/visits, and the competency of the personnel on the unit.
>
> Staffing patterns and staffing distribution are designed to meet the nursing care needs of groups of patients within the framework of pertinent institutional factors and resources.
>
> The parties agree that the determination of staffing needs is a constant, dynamic process influenced by a number of factors including: patient acuity, technology, unit and hospital census, standards of professional practices, resources, competency of staff, staff mix, productivity, vacancies (including leaves of absence, vacation, etc.), unplanned absences (including sick calls, emergencies, etc.), service specialty, nature of services, needs and acuity of both the Hospital and unit patient population, and applicable federal, state, local and JCAHO regulations.

(Brodsky Aff. Ex. A, at § 3.07.)

   Montefiore's staffing of nurses throughout the pandemic has been entirely consistent with

the above-referenced provision of the CBA, as well as the management rights provision in the

CBA, which provides that the "[e]mployer retains the sole and exclusive right to direct,

19

designate, schedule and assign duties to the work force." (Brodsky Aff. Ex. A, at § 14.)  Indeed,

the only instance when Montefiore deviated from the staffing ratios in the CBA was to comply

with Governor Cuomo's order requiring that hospitals double their capacity to care for COVID-

19 patients.  (*See* Scanlan Aff. ¶¶ 10-12, 26.)  Accordingly, the Union has not established any

likelihood of success on the merits with respect to staffing matters.

The Union also raises conclusory concerns regarding nurses operating unfamiliar

equipment or not receiving adequate training for the tasks assigned.  While there are no specific

examples cited in the Union's papers, Montefiore provides nurses with specialized training

relevant to their duties as they relate to COVID-19, and management staff is constantly available

to assist and answer questions.  (Scanlan Aff. ¶ 26.)

4. *Montefiore Provides Nurses with Leave and Accommodations In Accordance with Applicable Laws.*

The Union also raises conclusory concerns regarding reasonable accommodations and

leave requests.   Although these vague allegations are insufficient to demonstrate a contractual

violation, Montefiore has provided reasonable accommodations as required by the law. (*See*

Brodsky Aff. ¶ 25.)  The Union also raises concerns about nurses being required to use their sick

bank time for COVID-19 related leave.  As Montefiore has advised the Union, that is not the

case.  (Brodsky Aff. ¶ 23) Montefiore is not charging anyone's sick bank for COVID-19 related

leave and anyone who had their bank charged before is being made whole.  (Brodsky Aff. ¶ 23.)

This dispute is therefore indisputably moot.

5. *Montefiore Provides Nurses With Infection-Protected Donning and Doffing Space.*

The Union also raises a new dispute in this proceeding – not mentioned in its grievance –

about donning and doffing space. (Compl. ¶¶ 36-37.)  The donning and doffing space that is

provided is the same as it has been for decades (including during times numerous other

20

infections were present in the hospital) and meets all existing requirements for infection protection. (Madaline Aff. ¶¶ 26-29.)

*     *     *

Even if the Union was able to demonstrate non-compliance with the terms of the contract (which it cannot), it is well-settled that the exigent and unprecedented circumstances associated with the current national health emergency would justify any technical non-compliance here. Indeed, employers maintain broad discretion in emergencies and exigent circumstances to make business decisions, provided their decisions are limited to the time that the exigency exists. Employers retain discretion for "those emergencies…which are so exceptional and so dangerous to the operations of a plant that measures going beyond the Agreement must be taken to cope with the problems." *Elkouri & Elkouri: How Arbitration Works*, Chapter 13.13.E Management Rights, Emergencies (citing *Virginia-Carolina Chem. Co.* 42 Lab. Arb. Rep. (BNA) 237, 240 (1964) (Kesselman, Arb.)).  An employer's exercise of discretion has been found particularly appropriate where it was required to make staffing decisions to address an emergency.  *See Central Pa. Water Supply Co.*, 101 Lab. Arb. Rep.  (BNA) 873 (1993) (Talarico, Arb.) (holding that when a large water main broke, employer had the right to make staffing decisions based on employees able to fix the problem most capably); *See In re Arbitration Between Local 227, United Food*, 94-23589, 1995 Lab. Arb. Rep. (BNA) Supp. 114061 (1995) (Ferree, Arb.) (employer did not violate the CBA by not paying wages when it closed the office for a "snow emergency" and instead required employees to either lose pay or use accrued time off); *Caribe Circuit Breaker Co.*, 74K/09572, 63 Lab. Arb. Rep. (BNA) 261 (1974) (Pollock, Arb.) (employer had right to close plant and was not required to pay wages because of power outage and floods); *See Bunny Bread Co.*, 74 Lab. Arb. Rep. (BNA) 55 (1980) (Yarowsky, Arb.)

21

(excusing payment under CBA that contained "guaranteed workweek" clause where Employer closed based on excessive snowfall).

Accordingly, the Union cannot establish any likelihood that it will succeed on the merits of any of its alleged contractual violations.

C.     **The Balance of the Equities and the Public Interest Weighs Decidedly in Montefiore's Favor.**

The Union's request for injunctive relief must be denied for the additional and independent reason that the balance of the equities and public interest tips decidedly in favor of Montefiore.  Montefiore is a hospital system located at the epicenter of the COVID-19 public health emergency.  The Union asks the Court to impose additional and new restrictions on Montefiore that, in its expert medical judgment, would impede its ability to care for patients and that would threaten the lives of patients.  The governmental agencies principally responsible for protecting public health have calibrated the risks associated with the need to protect health care workers while simultaneously providing health care to the general public.  There is no basis for the Union to disrupt that delicate balance.  But the Union is asking this Court to serve as a roving commission to second guess the judgments made by public health experts as to how best to care for patients while protecting healthcare workers – and the judgments of the healthcare experts at Montefiore tasked with implementing those recommendations.  The requested injunction inevitably would interfere with the split-second health care decisions that the Hospital is forced to make countless times per day.  This would be catastrophic, as succinctly stated by those on the front lines of this emergency:

- "All space is being used for patient service needs.  There are no "empty spots." Accordingly, if this Court were to require Montefiore to provide new, designated donning and doffing space for PPE, patient dedicated areas would need to be immediately repurposed and our ability to service the number of patients in need would be severely restricted."  (Madaline Aff. ¶ 28.)

- "Nonetheless, if NYSNA's request is implemented, Montefiore would have to turn away patients as there are not sufficient negative pressure rooms or HEPA filters for all patients. The requirement of adding additional negative pressure rooms at this time thus would have a marked negative impact on patient care because, contrary to the Governor's directive, we would be required to turn patients away." (Madaline Aff. ¶ 45.)

- "If we are restricted in our ability to respond to this emergency, both patient outcomes and the health of our front line care providers will suffer dramatically.  Just by way of example, NYSNA has asked the Court to impose upon us an order that PPE be provided in "sufficient number so that they may be changed when needed." That is an impossible standard for the hospital to apply.  Who determines when a change is needed if not the CDC?  How much is a sufficient number to have on hand?  If we do not have what is subsequently determined to be "sufficient" because nurses determine to change their mask following every interaction, does that mean we will be held in contempt? . . .  The Union asks the Court to require "adequate" training.  Who will decide that if not the medical professionals at Montefiore who are experts in infectious disease protocols?" (Racine Aff. ¶ 24.)

Moreover, the newly enacted Emergency Disaster Treatment Protection Act – a public health law, which shields health care facilities and professionals from most forms of civil and criminal liability during the pendency of Governor Cuomo's COVID-19 emergency declaration — recognizes the primacy of allowing health care providers to focus on patient care during this emergency.   Indeed, the "Declaration of purpose" states that "[i]t is the purpose of this article to promote the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency." *See* N.Y. Pub. Health Law § 3080.

The "public interest" here in a very real sense is represented by the "public"—those who are sick and coming to this world-renowned hospital for life saving care.  It is the very apex of the public interest that Montefiore be allowed to continue to provide that care without vague and ill-defined restrictions that would take nurses away from the bedsides of the ill and paralyze the ability of Montefiore to respond to this ever-changing emergency.  (*See* Racine Aff. ¶ 25.)

23

Moreover, if Montefiore is forced to deviate from its standards of care by operation of judicial decree, other hospitals that are following the exact same public health agency guidelines will feel compelled to follow suit, causing massive disruption throughout the healthcare industry.

The Union completely ignores these critical patient-centric considerations, dismissing the "balancing of the equities" factor with the back of its hand with its outrageous suggestion that the *only* harm to Montefiore that would result from its open-ended injunction would be "perhaps the relatively modest cost of supplying PPE." (Dkt. 6 at 23.) This offensive remark is completely baseless. Montefiore's decision-making has been guided by how best to provide patient care while protecting its personnel, and trying to procure whatever PPE and testing has been available throughout this pandemic *regardless of cost*. (*See generally* Savini Aff.)

Accordingly, the Union's requested injunction should be denied because the balance of the equities weighs decidedly in favor of Montefiore favor and the health and safety of the public at large.

## III.   THE UNION'S COMPLAINT SHOULD BE DISMISSED

The Union's Complaint contains a single claim for injunctive relief, purportedly an injunction in aid of arbitration pursuant to the extremely limited exception to the NLA's prohibition on injunctions under the reverse *Boys Markets* doctrine. For the reasons set forth above, the Union has failed to satisfy the purposefully exacting requirements necessary to obtain that relief, and the Court therefore lacks jurisdiction to issue the requested injunction. Because there can be no injunction, the Complaint should be dismissed with prejudice. *See New York v. Hotel, Nursing Home & Allied Health Servs. Union*, 410 F. Supp. 225 (S.D.N.Y. 1976) (denying *Boys Markets* injunction and dismissing complaint).

24

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in the affidavits accompanying this memorandum of law, the Court should deny the Union's request for injunctive relief in its entirety and dismiss the Complaint with prejudice.

Dated: April 23, 2020

Respectfully submitted,

PROSKAUER ROSE LLP

By: */s/ Neil H. Abramson*

Neil H. Abramson
Eleven Times Square
New York, New York 10036
(212) 969-3000
nabramson@proskauer.com
*Attorneys for Montefiore Medical Center*